**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Robert Irving EYSTER, a/k/a Bobby,
Jack Leroy Marshall, Defendants–
Appellants.**

No. 89–7925.

United States Court of Appeals,
Eleventh Circuit.

Dec. 17, 1991.

**1198**

Bronis & Portela, P.A., Stephen J. Bronis, Miami, Fla. and Beskind & Rudolf, P.A., Thomas K. Maher, Chapel Hill, N.C., for Robert Irving Eyster.

Susan G. James, Jeffery C. Duffey and Algert S. Agricola, Jr., Montgomery, Ala., for Jack Leroy Marshall.

J.B. Sessions, III, U.S. Atty., Gloria A. Bedwell, Asst. U.S. Atty. and Charles A. Kandt, Mobile, Ala., for plaintiff-appellee.

Before FAY and BIRCH, Circuit Judges, and KAUFMAN *, Senior District Judge.

FAY, Circuit Judge:

In a multi-count, multi-defendant indictment, appellants Robert Eyster and Jack Marshall were charged with participating in an on-going conspiracy to import and distribute cocaine. The jury convicted Eyster of one count relating to a failed importation attempt and Marshall of seven counts relating to the conspiracy. Among their several challenges to their respective convictions, the appellants contend that the district court erred in permitting the government to improperly vouch for the credibility of a key witness and misrepresent to the jury that extrinsic evidence would explain away the witness' perjury. Because we find prosecutorial misconduct and other substantive and procedural errors that prejudiced the appellants, we REVERSE both appellants' convictions and REMAND for a new trial.

## I. BACKGROUND

Several seemingly unrelated incidents occurring over a three-year period and involving the importation of cocaine into Mississippi and Alabama form the backdrop of this appeal. An investigation into these incidents eventually resulted in the indictment of twenty-four individuals, of which

---

* Honorable Frank A. Kaufman, Senior U.S. District Judge for the District of Maryland, sitting by designation.

five were jointly tried. This appeal concerns the fair conduct of that trial.

## A. The Investigation

On June 22, 1986, police and narcotic officers found sixteen burlap sacks containing 711 kilo bricks of cocaine left abandoned by the side of an airstrip in Waynesboro, Mississippi. Two more large sacks containing smaller bricks of cocaine had been dragged into the woods off the side of the runway. An investigation ensued to determine what had happened but no arrests followed.

A little more than a year later, on the night of September 25, 1987, a small plane crash-landed at Demopolis Airport in Alabama, exploding into a ball of fire. Dental records identified the burned body of the pilot, found by the roadside, as Fred Hartley. The body of the pilot's brother, Joe Hartley, was found charred inside the wreckage. Two hundred thirteen red and green packages containing cocaine were found all over the road. Again, an investigation did not produce any immediate arrests.

On the evening of December 10, 1988, the local police chief from Marion, Alabama responded to a call from a patrol officer that unusual activity was going on at a small airstrip called Vaiden Field in Perry County. Various law enforcement officers arrived at the airstrip just as a long-nosed twin-engine plane taxied for departure in the dark. With their blue lights flashing, the police cars swerved to avoid a collision with the plane as the plane headed directly toward the cars on the airstrip. Moments after the plane escaped into the night, the police turned their attention to a moving vehicle at the end of the runway. The police gave chase and soon seized an S–10 pick-up truck containing radios, emergency lights, generators, extension cords, and other equipment. An extensive on-site search failed to locate any suspects.

The next day, law enforcement agents traced the Cessna 404 Titan to the Muscle Shoals Airport in the northern part of the state and apprehended the pilots as they were waiting to board a commercial flight at the airport. Initially the pilots falsely identified themselves but continued questioning revealed that the pilots were Patrick Abbott and Robert Clark. Abbott and Clark soon obtained immunity from prosecution in exchange for information on their activities and their cooperation in obtaining further evidence. They maintained their relationship with a group of smugglers and recorded a series of conversations with members of this group during the planning of an importation of a load of cocaine intended to take place in March 1989.

As a result of the investigation into the Demopolis crash, an individual named Tony Chambless, through his attorney, approached law enforcement agents and negotiated a plea agreement with the government. Chambless identified persons whom he maintained were involved in the Demopolis incident. He explained how a large hunting camp had been used in Sumpter County as the home base for an on-going operation where a number of loads of cocaine had been imported into Alabama.

Chambless identified the same people identified by Abbott and Clark. The government set up surveillance to observe the individuals named by these men and tracked the group over several months. In May 1989, a tape-recorded conversation between Clark and one of the named individuals indicated that imminent harm awaited a government agent, witness, or informant. Law enforcement decided to end the investigation and make arrests.

The investigation led to an indictment charging twenty-four defendants with an on-going conspiracy to import and distribute cocaine by plane into the Southern District of Alabama from 1982 through the spring of 1989.[1] The drug-trafficking en-

---

1. Counts 1 and 2 alleged a continuing criminal enterprise administered by Richard Lynn and Ricou DeShaw, two of the five defendants in this case. Count 3 charged conspiracy to possess with intent to distribute cocaine. Counts 4,

6, 8, 9 and 11 charged importation of cocaine, Counts 5, 7, 10, 12 and 13 charged possession with intent to distribute cocaine, and Count 14 charged possession and use of a firearm during the commission of a crime. Count 15 charged

terprise allegedly smuggled massive amounts of cocaine, at least 600 kilograms per load, several times a year over several years. Five of the twenty-four defendants were tried jointly and that trial is the basis of this appeal. Of the remaining nineteen defendants, seven were fugitives, nine entered into plea agreements with the government, two were set for a separate trial, and one was in other custody. The five defendants tried jointly were Richard "Dickie" Lynn, Ricou DeShaw, Craig Keaser, Robert "Bobby" Eyster, and Jack Leroy Marshall.

The government claimed that Lynn principally directed and administrated a criminal organization that included pilots, personnel who assisted at a refueling stop in Belize, personnel who off-loaded cocaine and refueled planes in Alabama, radio operators who monitored the planes and scanned law enforcement communications, and personnel that distributed the cocaine to sites throughout Alabama, Mississippi, and Florida. The prosecution alleged that DeShaw also managed the organization and served as a pilot. Keaser was alleged to have transported cocaine from Alabama to South Florida. Eyster allegedly acted as the radio operator in Alabama. The government claimed that Marshall was an armed "enforcer" who provided intimidation when directed and that he often removed the cocaine from the airplanes and transported the cocaine to other locations for distribution.

After arraignment and the setting of the trial date, Marshall filed a motion for the inspection of jury lists and a motion to compel a jury selection date. The district court entered an order authorizing Marshall's inspection of the jury selection plan. Lynn, Eyster, and Marshall objected to the jury selection process on the grounds that the venire was selected alphabetically and not on a random basis. Lynn's counsel filed a motion with an affidavit complaining

of a Sixth Amendment violation. The district court denied the motion.

A month before the trial, Marshall filed a motion to suppress unspecified evidence from a house in Miami on the grounds that Marshall's brother, who consented to the search, was coerced, did not have "common authority" over the premises, and was not a defendant or in any way involved. The government objected, asserting that the motion failed to establish Marshall's standing to contest the search. Marshall then testified in an effort to supplement the motion. The district court denied the motion to suppress without a hearing on the grounds that Marshall failed to establish standing.

### B. The Trial

Although the government produced extensive documentary and physical evidence, the government's case against Eyster, and to a lesser degree Marshall, depended heavily on the credibility of witnesses who testified pursuant to plea agreements. The primary government witnesses testifying against Eyster and Marshall, who are the subjects of this appeal,[2] were Robert Clark, Patrick Abbott, Hilary DeWeese, Steve Purvis, Mike Barclay, and Kevin Sheehy. All of these government witnesses were originally named in the indictment.

As noted previously, Clark and Abbott were the pilots who were involved in the incident at Vaiden Field, which resulted in Clark and Abbott cooperating with the government. Pursuant to their plea agreements, Clark and Abbott testified that they often flew to Colombia for cocaine and returned to the United States after a refueling stop in Belize. After being recruited by Hilary DeWeese in 1987, Clark selected Abbott as his co-pilot and flew all the flights that were the subject of the

unlawful transportation of a firearm, Count 16 charged attempt to import cocaine, and Counts 17 and 18 addressed forfeiture.

**2.** DeShaw and Keaser were acquitted on all counts. Lynn was convicted on five counts and sentenced to life imprisonment without parole.

He escaped from custody on March 23, 1990. His appeal was dismissed on August 17, 1990. Lynn was eventually recaptured on August 29, 1990 and faces charges in the Southern District of Mississippi for alleged cocaine importation.

substantive counts.[3] Clark testified about the importation and distribution counts and Abbott provided additional testimony about his travels to Belize. Clark testified that a "Bobby" operated the radios in Alabama and that he once met this "Bobby" in Tampa but Clark never identified Eyster as someone he spoke with on the radio and was unable to identify a photograph of Eyster as this "Bobby." Likewise, Abbott did not identify Eyster as someone he spoke with during his flights. Abbott, however, did testify that Lynn told him that Eyster ran the radio for the landing at Vaiden Field.[4] Both Clark and Abbott linked Marshall with the Demopolis incident but neither witness offered evidence concerning Eyster and Marshall during the period they cooperated with the government.

After several witnesses testified, including law enforcement personnel and other members of the drug-trafficking enterprise of lesser importance, the government called DeWeese, Purvis, Barclay, and Sheehy. Purvis and DeWeese admitted being present at each of the importations charged in the substantive counts. They were long-time friends and acted as partners, briefly heading the organization during the importations in mid–1987. Barclay, DeWeese's stepson, assisted in the smuggling. Sheehy had been active in smuggling in 1984 and 1985 and had gone to prison in 1985. After his release in 1987, Sheehy participated in the importation at Demopolis and in an importation in June 1988.

Purvis stated that he knew Eyster and Marshall from growing up in the Florida Keys. He testified at length concerning numerous drug-smuggling ventures and that Eyster, Marshall, and others were involved in various importations. Purvis, however, admitted that he was a habitual marijuana user, that he had trouble remembering dates, and that he had discussed his testimony with DeWeese while they were incarcerated together during the trial.

DeWeese and Barclay were also called as government witnesses. DeWeese's testimony tracked that of Purvis in most respects. DeWeese had been Purvis' partner and was principally involved in setting up the off-loading crew. DeWeese identified Eyster as the radio operator for the importations charged in the substantive counts, with the exception of one load in which a Butch McKeown served in that role. DeWeese testified that Eyster operated the radios during the September 1987 and December 1988 importations, and that Marshall was actively involved in the conspiracy. Barclay testified as to the same events as DeWeese, implicating both Eyster and Marshall.[5]

The defense vigorously attacked the credibility of Purvis, DeWeese, and Barclay, by noting under cross-examination that all three testified pursuant to plea bargains, that Purvis was a consistent drug user, that DeWeese was on parole from a previous conviction when he became involved in the conspiracy and that he gave apparent inconsistent statements under oath, and that Barclay once falsely reported the source of money he was found carrying. The defense also noted that Clark and Abbott had complete immunity in exchange for their testimony despite earning between $700,000 and $1 million for their smuggling.

The government also relied on the testimony of Kevin Sheehy. Sheehy testified that he had known Lynn, DeShaw, and Eyster since childhood and Marshall since high school. He had smuggled marijuana and cocaine with Lynn in the early 80's.

---

3. Counts 5 and 6 accounted for a flight in June 1987; Counts 7 and 8 accounted for a flight in July or August 1987; Counts 10 and 11 reflected a flight in June 1988; and Counts 12, 13, and 14 accounted for the incident at Vaiden Field in December 1988. Clark and Abbott were scheduled to fly in late September 1987, but that trip was cancelled when Fred and Joe Hartley crash-landed on September 25th at Demopolis Airport. The crash was the subject of Count 9.

4. The jury acquitted Eyster on the counts relating to this incident.

5. Barclay did not testify pursuant to a formal plea agreement but he testified that he expected some consideration for his testimony.

Unlike the other government witnesses, however, Sheehy had been in jail from August 1985 until June 15, 1987, and in a halfway house in Miami from the date of his release until July 30, 1987. Sheehy's first involvement with the organization after his release was on September 25, 1987, during the importation that resulted in the crash that killed the Hartley brothers, which was the subject of Count 9 of the indictment.

Four days before trial, Sheehy entered into a plea agreement, admitting guilt not to Count 9, but to Count 7, which related to events that occurred while he was still in Miami and in which he could not possibly have been involved.[6] At trial, Sheehy was aware that he had plead specifically to Count 7.[7] It is uncertain why Sheehy did not plea to Count 9.[8] The district court was not alerted during Sheehy's plea that he was not involved in the importation to which he was pleading.

Sheehy testified about how he became involved in the conspiracy and detailed what happened the night of the crash at Demopolis Airport. He testified that he helped Eyster set up the radios, that he overheard conversations between Lynn and the pilots, and that after the crash he left the camp with Eyster and drove to New Orleans. Sheehy also testified that Marshall was present in Alabama during several importations and that Marshall left Alabama driving a load of drugs to Florida.

The defense hotly contested Sheehy's credibility by attacking his apparent willingness to falsely admit to guilt in order to receive the benefits of a plea. Defense counsel for Lynn cross-examined Sheehy about his agreement:

6. Count 7 related to the importation of 600 kilos of cocaine into Alabama during July or August 1987.

7. The following testimony occurred during direct examination at trial:

[AUSA BEDWELL]: Have you also entered a guilty plea in connection with charges in this district?
[MR. SHEEHY]: Yes, I have.

[MR. BLACK, Counsel for Lynn]: Are you telling us that you pled guilty to something that you're innocent of?
MS. BEDWELL [AUSA]: Your Honor, that calls for a conclusion of the law which the witness is not qualified to make.
THE COURT: Well, rephrase it, counsel. You can ask it but just rephrase it.
MR. BLACK: All right. You've pled guilty to a crime that says that on July or August of 1987 you imported 600 kilos of cocaine into the United States; isn't that correct?
[MR. SHEEHY]: That's correct.
Q: And according to your testimony— well, where were you in July and August of 1987?
A: I was—the entire month of July I was in the halfway house. I was living in the Keys.
Q: So you couldn't do that. How about in August of '87?
A: I was living in the Keys.
Q: Were you involved in any kind of crime at that time?
A: No.
Q: Had you agreed to commit any importation of drugs?
A: No.
Q: Did you assist in any importation of drugs?
A: No.
Q: Did you go to Demopolis, Alabama and do anything whatsoever?
A: No.
Q: Did you assist in putting cocaine on or off the plane?
A: No.
Q: So I take it you had absolutely nothing to do with this crime of July or August of '87?

Q: Do you recall which charge you entered a plea to?
A: It was Count seven of the indictment. (R14:2747).

8. One possibility suggested in the appellant's brief is that Sheehy was unwilling to plea to Count 9 because it involved the deaths of two pilots, which might have colored his sentencing. Indeed, his attorney objected to any evidence of the crash during his plea. (R16:3368–69).

A: That's a correct assumption.

Q: Isn't it a fact, sir, that your guilty plea in this case in your plea bargain is based upon a fraud?

A: I don't know if it is or not.

(R14:2819–20).

This line of questioning was taken up by Eyster's counsel during further cross-examination of Sheehy:

[MR. BRONIS, Counsel for Eyster]: Mr. Sheehy, Mr. Black asked you some questions and wrote some dates on the blackboard and you told this jury that you told your lawyer that you didn't commit the offense in Count 7 which charged you with importing cocaine in July or August of '87. You told that to your lawyer; is that right?

[MR. SHEEHY]: Yes.

Q: Yet four days before this trial began, on September 7th, 1989, you appeared in this courtroom before this very judge and took an oath to tell the truth and entered a guility [sic] plea to that count, correct?

A: Yes.

Q: And didn't Judge Butler, while you were under oath, ask you pointblank if you were pleading guilty to Count 7 of that indictment because you were guilty?

A: Yes.

Q: And didn't you answer him, "Yes, sir, I am pleading guilty because I am guilty"?

A: Yes.

Q: And that was a lie?

A: Technically speaking, yes. It was—

Q: There's no technically about it. That was a lie pointblank to this judge four days before this trial began, was is [sic] not?

MS. BEDWELL [AUSA]: Your Honor, again that calls for a legal conclusion. We object to the form of the question.

THE COURT: Overruled.

MR. BRONIS: Was it not, sir?

[MR. SHEEHY]: Yes.

Q: But in order to get the benefit of this deal, you felt it was in your best interests to lie four days before this trial began, correct?

A: Yes.

(R14–15:2838–40).

On re-direct examination, the government sought to rehabilitate Sheehy's admission of perjury with the following exchange:

MS. BEDWELL [AUSA]: With regard to your plea agreement, I had the indictment in my hand, if—do you remember what Count 9 of the indictment charges?

[MR. SHEEHY]: No.

Q: Can I refresh your recollection by showing it to you?

A: Yes.

Q: Okay.

A: Yes.

Q: Does Count 9 charge the offense involving the crash at Demopolis?

A: Yes.

Q: And were you there at that time?

A: Yes.

Q: So if this seven was actually a nine, it would be a reference to the instance when you were; is that right?[9]

MR. LAZZARA [Counsel for DeShaw]: Your Honor, I object. If a lot of things happened, other things would happen.

MR. BLACK [Counsel for Lynn]: If a pig was a cow we could get milk out of it.

THE COURT: Counsel, let's not be facetious. State your grounds for the objection. I'll allow the question to be re-asked. I think I understand the point the Government is trying to make.

MS. BEDWELL: So if your guilty plea was to Count 9, that would be accurate and consistent with what you've testified to today; is that correct?

[MR. SHEEHY]: Yes.

Q: And you've already indicated that you were under the impression that there was a typographical error on the plea agreement with regard to the number of

9. During cross-examination, defense counsel had written out the counts and corresponding dates on a blackboard. The Assistant United States Attorney, on redirect, changed Count 7 to Count 9 on the blackboard.

years; is that what you previously testified to?[10]

A:  That was my impression.[11]

(R15:2901–02).

Following this exchange, Eyster objected to the suggestion that Sheehy's plea was due to a typographical error, asserting that the government's redirect was in bad faith. The district court overruled, noting that "the jury will draw its own conclusions from what the evidence and the facts are in the case." (R15:2903).  The prosecutor then asked Sheehy, "Was Mr. Sessions, the U.S. Attorney present during the time your plea was taken?" and Sheehy responded, "Yes."  *Id.*

Shortly thereafter, Eyster, joined by his co-defendants, moved for a mistrial on the grounds that the prosecutor affirmatively solicited false testimony of a typographical error and intentionally misled the jury. The prosecutor responded that it was her good faith belief that a typographical error occurred, that she was not involved in Sheehy's plea negotiation, and that United States Attorney J.B. Sessions engaged in the negotiations for all the defendants. The district court denied the motion, noting that defense counsel remained free to argue Sheehy's credibility before the jury. The sidebar ended with the following exchange:

> MR.  BRONIS [Counsel for Eyster]: Your Honor, in order that the record is completely clear ... I request that Your Honor insist upon an affirmative representation by the Government of what details [are in its possession] that lead[ ] it to the conclusion that Count 7 as worded in the plea agreement is a typographical error.
>
> MS.  BEDWELL [AUSA]:  Because it happens all the time.  It happens all the time.

(R15:2914–15).

Later in the trial, after reviewing Sheehy's plea colloquy, Eyster, joined by

his co-defendants, renewed his motion for mistrial.  Eyster noted that the plea colloquy revealed that Assistant United States Attorney Bedwell attended the colloquy and not United States Attorney Sessions, contrary to the prosecutor's assertion, and that on three different occasions during the colloquy, Sheehy, with the benefit of counsel, specifically pled to Count 7 and on one occasion distinguished the events relative to Count 9.  The prosecutor responded that she remained convinced that the plea was inadvertently entered on an incorrect count and that it wasn't "fair to impune [sic] the witness with perjury for someone elses [sic] mistake." (R16:3373).  The district court again denied the motion.

The jury convicted Eyster on Count 9. Marshall was convicted on Counts 5, 6, 10, 11, 12, 13 and 16.  Eyster filed a motion for an evidentiary hearing and a new trial asserting that government witnesses Sheehy, Purvis, and DeWeese engaged in repeated and intentional violations of the sequestration order, discussing their testimony and tailoring what they were to say.  The district court denied the motion without a hearing.  Eyster filed an addendum to his motion and a motion for reconsideration. Marshall adopted these motions.  The district court denied these motions as well.

The district court then conducted sentencing hearings.  At the hearing, Marshall objected to certain facts in the pre-sentence investigation and to the calculation of the sentencing guidelines and its application to the case.  The district court overruled the objections, sentencing Marshall to 293 months on each count to run concurrently, followed by a five-year supervised release term, and a $100,000 fine with an additional special assessment.  Eyster was sentenced to seventeen years imprisonment, followed by a special parole term of five years.  The district court did not impose a fine but ordered Eyster to pay a $50 special assessment.

---

10. Apparently, there was a typographical error on the plea agreement regarding the length of sentencing.

11. Sheehy withdrew his plea to Count 7 and entered a plea to Count 9 on November 9, 1989. The district court sentenced him to 11 years imprisonment without parole, 5 years special parole term, and $50 special assessment.

## II. DISCUSSION

Eyster and Marshall raise several issues on appeal. We first address those issues raised by the appellants deserving careful review, and then briefly address issues with lesser or no merit.

### A. Improper Vouching

Appellants Eyster and Marshall assert that the government's redirect questioning of Kevin Sheehy constituted improper vouching that significantly undermined the defense of their case. Their defense rested on the argument that Sheehy was willing to commit perjury to help himself and that he should not be believed. The appellants contend that the government, realizing that Sheehy's credibility had been seriously damaged under cross-examination, misled the jury by suggesting on redirect that Sheehy's plea to Count 7, instead of to Count 9, was due to a typographical error. In short, they allege that the district court denied the appellants a fair trial by permitting the government to hide Sheehy's willful perjury by implying that it was an inadvertent mistake.

The appellants argue that by asking Sheehy "if this seven was actually a nine," changing the "7" that defense counsel had written on the blackboard to a "9," and asking Sheehy whether he was under the impression that the plea agreement contained a typographical error when it apparently did not, the prosecutor effectively put before the jury false extrinsic evidence concerning Sheehy's plea. Moreover, any claim of "good faith" by the government was disingenuous because Sheehy's plea colloquy transcript revealed that the prosecutor had in fact been present during Sheehy's plea, which had been entered only four days before trial.

Eyster also asserts that Sheehy was the most critical witness to testify against him because the jury credited Sheehy's version regarding Count 9 while rejecting the testimony of Purvis, DeWeese, and Barclay who testified on most if not all of the counts. The jury acquitted Eyster on all counts, with the exception of Count 9—the principal count Sheehy testified about. Marshall similarly argues Sheehy's importance as a witness against him, noting that DeWeese and Barclay testified that Marshall was at the Demopolis site when the plane crashed, but Sheehy testified that Marshall was not present. The jury acquitted Marshall of Count 9, presumably crediting Sheehy's account.

The government responds that the district court made it clear to the jury that there was no typographical error.[12] Further, the district court's comment and the government's silence in closing argument about the "typographical error" defuse appellants' conclusions about what the jury may have gathered about the government's allusion to extrinsic evidence. The government also argues that Sheehy was not a chief or key witness—that he did not possess any special, different, or extra knowledge regarding any of the defendants on trial. Purvis, DeWeese, and Barclay all testified, along with Sheehy, that Eyster was present during the crash at Demopolis, and Purvis, DeWeese, Barclay, Clark, and Abbott identified, as did Sheehy, that Marshall was present during the June 1988 importation. Thus, Sheehy's testimony relating to all five defendants on trial was cumulative when examined in light of the government's evidence as a whole, which included the testimony of forty-six other witnesses, and whatever error may have

---

12. Appellant Eyster notes that the district court did not instruct the jury to disregard any insinuation that the *plea agreement* contained a typographical error. Rather, the district court made mention of the *indictment,* which was not at issue:

> MR. BRONIS [Counsel for Eyster]: I believe that's a bad faith question. I don't think there's any question that this is a typographical error.

> THE COURT: *Oh, in the indictment?* I don't think, and I'll tell the jury that that's not what you're talking about, some typographical error.

> MR. KARTEN [Counsel for DeShaw]: That's the impression this prosecutor is trying to leave with the jury.

> THE COURT: Well, the jury will draw its own conclusions from what the evidence and the facts are in the case. Go ahead, Ms. Bedwell.

(R15:2903) (emphasis added).

occurred had no substantial influence on the outcome.

Lastly, the government claims that it is "unthinkable" that the prosecutor would have intentionally misled the court or the jury under these or any circumstances. The government reasserts that the redirect examination of Sheehy was posed in good faith, that the prosecutor had a simple lapse of memory regarding who was present at the plea colloquy that had occurred a full four weeks prior to the date Sheehy testified, that because of the theory of vicarious liability there was no need to enter into a sham plea agreement,[13] and that typographical errors were not uncommon. Moreover, the district court later instructed the jury to disregard statements made by counsel during trial.

Where, as here, the defendant objects contemporaneously at trial to alleged improper vouching, our review is plenary because improper vouching is a mixed question of law and fact. *See, e.g., United States v. Shaw*, 829 F.2d 714, 716–18 (9th Cir.1987) (applying plenary review), *cert. denied*, 485 U.S. 1022, 108 S.Ct. 1577, 99 L.Ed.2d 892 (1988); *United States v. Sims*, 719 F.2d 375, 377–78 (11th Cir.1983) (same), *cert. denied*, 465 U.S. 1034, 104 S.Ct. 1304, 79 L.Ed.2d 703 (1984).[14]

To find prosecutorial misconduct, a two-pronged test must be met: (1) the remarks must be improper, and (2) the remarks must prejudicially affect the substantial rights of the defendant. *United States v. Walther*, 867 F.2d 1334, 1341 (11th Cir.), *cert. denied*, 493 U.S. 848, 110 S.Ct. 144, 107 L.Ed.2d 103 *and cert. denied*, 493 U.S. 978, 110 S.Ct. 506, 107 L.Ed.2d 508 (1989); *United States v. Lacayo*, 758 F.2d 1559, 1565 (11th Cir.), *cert.*

*denied*, 474 U.S. 1019, 106 S.Ct. 568, 88 L.Ed.2d 553 (1985). "'Attempts to bolster a witness by vouching for his credibility are *normally* improper and error.'" *Sims*, 719 F.2d at 377 (emphasis added) (quoting *United States v. Ellis*, 547 F.2d 863, 869 (5th Cir.1977)). Such attempts are *indeed* improper if the jury could reasonably believe that the prosecutor indicated a personal belief in the witness' credibility. *Id.* A jury could reasonably believe the prosecutor's indications if the prosecutor either places the prestige of the government behind the witness, by making explicit personal assurances of the witness' veracity, or the prosecutor implicitly vouches for the witness' veracity by indicating that information not presented to the jury supports the testimony. *Id.* In short, the government cannot argue the credibility of a witness based on the government's reputation or allude to evidence not formally before the jury. *United States v. Hernandez*, 921 F.2d 1569, 1573 (11th Cir.), *cert. denied*, — U.S. —, 111 S.Ct. 2271, 114 L.Ed.2d 722 (1991).

As to the second prong of the test for prosecutorial misconduct, remarks prejudicially affect the substantial rights of the defendant when they "so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process." *See Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974). As we recently made clear in *Kennedy v. Dugger*, 933 F.2d 905 (11th Cir. 1991), improper argument rises to the level of a denial of due process when "'there is a "reasonable probability" that, but for the prosecutor's offending remarks, the outcome of the ... [proceeding] would have been different.'" *Id.* at 914 (quoting *Williams v. Kemp*, 846 F.2d 1276, 1283

---

**13.** The theory of vicarious liability provides that a defendant may be found criminally liable even if he did not personally commit a substantive offense. *United States v. Broadwell*, 870 F.2d 594, 602–04 (11th Cir.), *cert. denied*, 493 U.S. 840, 110 S.Ct. 125, 107 L.Ed.2d 85 (1989). Thus, a conspirator can be held accountable for the reasonably foreseeable substantive offenses committed by his coconspirators whether or not he personally participated. *Id.; see also United States v. Roper*, 874 F.2d 782, 787–88 (11th Cir.),

*cert. denied*, 493 U.S. 867, 110 S.Ct. 189, 107 L.Ed.2d 144 *and cert. denied*, 493 U.S. 955, 110 S.Ct. 369, 107 L.Ed.2d 355 (1989).

**14.** Where the defendant does *not* object to comments made by the prosecution at trial, the standard of review is plain error. *United States v. Hernandez*, 921 F.2d 1569, 1573 (11th Cir.), *cert. denied*, — U.S. —, 111 S.Ct. 2271, 114 L.Ed.2d 722 (1991).

(11th Cir.1988), *cert. dismissed,* 489 U.S. 1094, 109 S.Ct. 1579, 103 L.Ed.2d 931 (1989), *cert. denied,* 494 U.S. 1090, 110 S.Ct. 1836, 108 L.Ed.2d 965 (1990)). " '[A] reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *Id.* (quoting *Williams,* 846 F.2d at 1283 (quoting *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984))).

In this case, we hold that the government's questioning of Sheehy on redirect meets both prongs of the test for improper vouching. The prosecutor's comments implicated the government's credibility, so infecting the trial with unfairness as to rise to the level of a denial of due process. Accordingly, the government's improper vouching requires the reversal of both appellants' convictions, especially in light of the other substantive and procedural violations in this trial.

◼ As we noted in *Hernandez,* "[t]he prohibition against vouching does not forbid prosecutors from arguing credibility, which may be central to the case; rather, it forbids arguing credibility based on the reputation of the government office or on evidence not before the jury." 921 F.2d at 1573. Sheehy's plea colloquy and testimony revealed that he was fully aware of the events of each count and which count he was pleading to. He unequivocally admitted on cross-examination that he lied "to get the benefit of th[e] deal." (R15:2840). By suggesting to the jury that Sheehy did not actually mean to plead to Count 7, but rather meant to plead to Count 9, and that his plea was the result of a typographical error, without having any evidence to that effect, the prosecutor threw the weight of her office behind the witness' testimony and implicitly vouched for the witness by indicating that information not before the jury supported Sheehy's credibility.

Implying the existence of additional evidence not formally before the jury severely impairs the likelihood of a fair trial. In *Berger v. United States,* 295 U.S. 78, 88–

89, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935), the Supreme Court reversed a conviction when the prosecutor through questioning and argument implied personal knowledge of additional evidence. The Court noted the government's unique burden of justice and heightened responsibility in court:

The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all. . . .

It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations *and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none.*

*Id.* (emphasis added); *see also United States v. Young,* 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985) (vouching may jeopardize the defendant's right to be tried solely on the evidence presented to the jury).

◼ It is irrelevant whether the prosecutor asked her questions in good faith. We do not attempt to divine whether the prosecutor indeed had a lapse of memory about the circumstances of Sheehy's plea or whether critical typographical errors are found with such frequency on government documents that affect the life and liberty of so many. Both of these problems should gravely concern the responsible officials, and both are simply inconsistent with the obligations of United States Attorneys. The appellants correctly argue that the prosecutor cannot vouch for the credibility of a witness even if she devoutly believes the facts she improperly places before the jury. Evidence comes from the witness stand, not from an attorney's mouth.

◼ We turn now to the second prong of the analysis.[15] We agree with the appel-

---

**15.** The appellants urge us to follow the Third Circuit and adopt a per se rule that reversal is mandated whenever the prosecutor comments

on the witness' credibility based on information outside the record. *See United States v. DiLore-*

lants that the improper vouching tainted the trial. The record supports Eyster and Marshall's contention that the essence of their defense was attacking the credibility of certain key witnesses testifying against them pursuant to plea agreements. As part of their strategy, the defense employed such classic tactics as questioning the witnesses' previous convictions, their capacity to remember events and recount them accurately, their alleged inconsistent statements under oath, their "willingness" to commit perjury to obtain a favorable plea, and pitting the testimony of one witness against another. The closing arguments of the prosecutor and the defendants principally involved the credibility of these witnesses and the nature and extent of the corroborating evidence. The prosecutor's improper vouching was an unfair and foul blow.

We find there is a reasonable probability that but for the prosecutor's improper comments, the outcome of the proceeding would have been different. We are swayed that no physical evidence was introduced connecting Eyster to the drug trafficking organization and that his conviction rested heavily on Sheehy's testimony. Purvis, DeWeese, and Barclay all linked Eyster to numerous importations that formed the basis of the several substantive counts against Eyster. The jury, however, acquitted Eyster on all counts with the exception of Count 9. We are sensitive to drawing any conclusions about the reasoning of the jury, but we do note that Sheehy testified at length about Count 9 at trial. But for the improper vouching, Sheehy's testimony may have been discredited.

More important, however, is that the government's reference to a typographical error was ultimately an outright falsehood designed to mitigate Sheehy's willful perjury, which the appellee conceded at oral argument.[16] Such a falsehood directly implicates how far the government would go to obtain a conviction. Given that Purvis, DeWeese, Barclay, and Sheehy all testified

pursuant to plea agreements, the government's misconduct in handling Sheehy's plea agreement bears on the government's credibility relative to the other witnesses as well. With the government's credibility at issue, the prejudicial impact carries over to all the defendants. Accordingly, both prongs of the test for prosecutorial misconduct have been met, requiring the reversal of Eyster and Marshall's convictions. *See Walther*, 867 F.2d at 1341.

**B. Marshall's Motion to Suppress**

■ Prior to the trial, on August 8, 1989, Marshall filed a motion to suppress evidence seized at a residential home in Miami owned by co-defendant Larry Givner a/k/a Larry Feldman a/k/a Lance Fleming. The residence was segregated into a main residence where Givner lived and a guest apartment where Marshall lived as a sublessee. At the time of the seizure, Marshall was in custody and an arrest warrant was pending against Givner. Ron Marshall, Jack Marshall's brother, was staying in the guest apartment when law enforcement taskforce agents arrived heavily armed with their weapons drawn. The agents allegedly handcuffed Ron Marshall for nearly an hour and threatened to take him "downtown" until he signed a Consent to Search form. After receiving consent, the agents seized evidence that included handwritten radio frequencies, a money counting machine, and a triple-beam balance scale from Jack Marshall's portion of the residence. Cocaine was not found.

As grounds for his motion to suppress, Marshall stated that Ron Marshall's consent was coerced and that his brother did not have any "common authority" over the premises. On September 1, 1989, the government filed a response alleging lack of standing. The district court ruled that Marshall's motion to suppress was defective under *United States v. Richardson*, 764 F.2d 1514, 1527 (11th Cir.), *cert. denied*, 474 U.S. 952, 106 S.Ct. 320, 88 L.Ed.2d 303 (1985), which held that a mo-

---

*to*, 888 F.2d 996, 999 (3d Cir.1989). We decline to do so.

16. Indeed, had the jury been advised of this fact, it might have concluded that the prosecution was devoid of any credibility.

tion to suppress must in every critical respect, including allegations of standing, be "sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that a substantial claim is presented." The district court found that Marshall's motion did not adequately allege any standing nor any expectation of privacy, and it therefore concluded that a hearing was unnecessary because of the lack of specific factual allegations.

Marshall requested that the district court allow him to testify to claim his residence and expectation of privacy or to allow him to amend the motion. The district court denied the request. Marshall moved the district court to reconsider on the ground that attached to the motion was an inventory prepared by the government identifying the residence as belonging to Marshall. The district court did not find the inventory in the court file but assumed that the attached exhibit indeed existed. The district court concluded, however, that any reference by the government in the inventory to the residence of Jack Marshall was not enough to provide sufficient standing to challenge the legality of the search. Marshall's counsel made a proffer that Marshall would testify that he was a sublessee of the property. The Court then allowed Marshall to orally amend his motion by testimony.

Under direct examination, Marshall testified that he was a sublessee of the guest house at the time of the search. Under cross-examination, however, Marshall admitted not knowing the address of the house or remembering when he rented the property. Defense counsel vigorously objected to questions about whether Marshall had a key to the residence when he was arrested or whether he knew who was in the house at the time of the search. Counsel also instructed Marshall not to answer how long he may have lived at the property. The district court found that Marshall did not show standing based on the evidence offered and the demeanor of the witness.

Marshall contends that the facts alleged in his motion to suppress coupled with his testimony that he was subleasing the apartment at the time of the search was sufficient to show standing under *Richardson*. The government cites us to *United States v. Baron–Mantilla*, 743 F.2d 868, 870 (11th Cir.1984), in which we held that:

> [t]o prevail on a claim that evidence was seized in violation of the fourth amendment, the defendant bears the burden of demonstrating a legitimate expectation of privacy in the areas searched. *Rakas v. Illinois*, 439 U.S. 128, 130 n. 1, 99 S.Ct. 421, 424 n. 1, 58 L.Ed.2d 387, 393 n. 1 (1978). In reviewing the district court's determination that the defendant has not satisfied his burden, we view the evidence adduced at the suppression hearing in the light most favorable to the government. *United States v. Torres*, 720 F.2d 1506, 1510 (11th Cir.1983).

Under this standard of review, we agree with the district court that under *Richardson*, 764 F.2d at 1527, the four corners of Marshall's motion to suppress did not show a legitimate expectation of privacy in the area searched to show standing.

However, the district court permitted Marshall to orally amend his motion. We find that Marshall's motion, coupled with the government's inventory identifying the residence as belonging to Marshall, and Marshall's averments that he was a sublessee of the residence at the time of the search, alleged sufficient facts to meet the test set forth in *Richardson*. *See United States v. Garcia*, 741 F.2d 363, 366 (11th Cir.1984) (owner, lessee, or occupant with a significant and current interest in the searched premises, has standing to challenge admission of evidence seized in a warrantless search of a home).

We note that in *United States v. Feldman*, Case No. 90–7125 (S.D.Ala.), a companion case to the instant matter, the government introduced the very items seized at the guest house against co-defendant Givner a/k/a Feldman. In *Feldman*, the government *conceded* in passing remarks in its brief and at oral argument, that the apartment it searched was, in fact, Jack Marshall's apartment. Marshall's standing was not at issue in *Feldman*.

There, the district court denied Givner's motion to suppress on the merits. We affirmed Givner's conviction. *United States v. Feldman*, 940 F.2d 673 (11th Cir.1991). But the issue of *Marshall's* standing was not resolved. Now, in this matter, the government refuted Marshall's standing as it sought to introduce against Marshall the very items it introduced against Givner. Although it is proper for the government to insist that individual defendants comply with the requirements of the law when making a motion to suppress, we are troubled that the government has taken both sides of the same issue in related prosecutions. Again, it does little to instill confidence in the credibility of those representing our government.

In any event, because of our finding that Marshall did show standing under *Richardson* and *Garcia,* we REMAND this matter to the district court for a hearing on the merits of Marshall's motion to suppress.

### C. The Sequestration of Witnesses

The appellants contend that they were severely prejudiced because Purvis, DeWeese, Barclay, and Sheehy discussed and allegedly tailored their testimony while confined at the Baldwin County Jail during the course of the trial, in violation of Rule 615 of the Federal Rules of Evidence,[17] or the rule of sequestration. They note that Purvis admitted discussing testimony with DeWeese and Sheehy while confined at the county jail, that DeWeese acknowledged talking to Purvis after Purvis began testifying, and that Barclay spoke with DeWeese by telephone during the trial.[18] DeWeese and Barclay, however, denied discussing any substantive matters. Sheehy de-

---

**17.** Federal Rule of Evidence 615 states, in relevant part: "At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion."

**18.** The appellants point to the following testimony:

> [MR. PURVIS:] To be perfectly honest, I didn't even remember making that trip but I talked to Mr. DeWeese and he informs me that in fact we did do that. I remember flying with Bob and Pat and if that is what we did, it wouldn't surprise me.
> [MR. BLACK, Counsel for Lynn]: I take it then you and Mr. DeWeese have talked about this somewhat?
> A: I am locked up with him and I told him I didn't remember doing this and he said that we did. And whether I did or not, I really don't know. I seem to remember it, yes.
> Q: At least, your memory refreshed by Mr. DeWeese in your jail cell is that you did this recon mission with Bob Clark?
> A: Yes, sir....
> (R10:1127).
> [MR. LAZZARA, Counsel for DeShaw]: Have you been locked up with other people who are also potential witnesses here?
> MR. PURVIS: Yes, sir.
> Q: Have you talked to them about these events?
> A: Not to any extent.
> Q: But you have to some extent?
> A: Yes, sir. I would say so. I talked to Kevin Sheehy.
> (R10:1183–84).
> [MR. LAZZARA]: You have been cell mates with Steve Purvis since you have been arrested on this offense?

> [MR. DEWEESE]: Yes, not cell mates but in the same jail.
> ....
> Q: Isn't it true that you and he have gotten together and talked about the testimony that you are giving here today and yesterday?
> A: Possibly in a general manner but he has not been in that area in the last week.
> Q: Possibly in a general manner. Explain to the jury what you mean by that?
> A: I believe that Steve and I both discussed what we possibly remembered.
> (R11:1639–40).
> [MR. BRONIS, Counsel for Eyster]: And you told this jury that you had contact with [DeWeese] over the phone?
> [MR. BARCLAY]: I never did have contact with him until I went in. Until I was arrested—until I turned myself in. I never had contact with him after he was arrested.
> Q: You told the prosecutor that you spoke over the phone.
> A: I did since I have been indicted. Since I have been—turned myself in we have spoke on the phone but up until that point I never did, no, sir.
> ....
> Q: Since you have been indicted you have been on the phone with him?
> A: We have talked a couple of times, yes, sir.
> Q: How are these phone calls arranged. He is in jail and you are where?
> A: He has called me at home a couple of times?
> A: Yes, sir.
> Q: Home in Kentucky?
> A: Yes, sir.
> (R16:3292–93).

nied discussing any testimony with Purvis or DeWeese either before or after their testimony. The district court denied the defendants' motion to strike the testimony of Purvis and DeWeese or for a mistrial based upon their alleged violation of the sequestration rule.

After trial, Eyster moved for an evidentiary hearing and a new trial based on alleged additional evidence that had to come to the defendants' attention that Sheehy had repeatedly discussed his testimony with Purvis and DeWeese during trial. The additional evidence, however, was unsworn, unattributed, and unsubstantiated. The district court denied the motion. Upon Eyster's motion to reconsider, joined by Lynn and Marshall, the district court issued a memorandum opinion and order, quoting *United States v. Reed*, 887 F.2d 1398, 1404 (11th Cir.1989), *cert. denied*, 493 U.S. 1080, 110 S.Ct. 1136, 107 L.Ed.2d 1041 (1990), to hold that in order to obtain a new trial based on newly discovered evidence, the court must be satisfied that:

> (1) the evidence must be discovered following trial; (2) the movant must show due diligence to discover the evidence; (3) the evidence must not be merely cumulative or impeaching; (4) the evidence must be material to issues before the court; and (5) the evidence must be of such a nature that a new trial would probably produce a new result.

The district court concluded that "the only value of the newly discovered evidence proffered by the defendants [was] impeachment," which is insufficient under *United States v. Vitrano*, 746 F.2d 766, 770 (11th Cir.1984). The court further concluded that the newly discovered evidence was not likely to produce a different result at trial because the testimony at trial was not alleged to have been untruthful and because that evidence was merely cumulative. (R6:41).

▮▮▮▮ The standard of review of the district court's denial of a motion for a new trial based on alleged violations of the se-

questration rule is abuse of discretion. *United States v. Lattimore*, 902 F.2d 902, 903–04 (11th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 272, 112 L.Ed.2d 228 (1990); *United States v. Jimenez*, 780 F.2d 975, 978 (11th Cir.1986). The district court's order is reversible only on a showing of prejudice. *Jimenez*, 780 F.2d at 978 (citing *United States v. Womack*, 654 F.2d 1034 (5th Cir. Unit B Aug. 1981), *cert. denied*, 454 U.S. 1156, 102 S.Ct. 1029, 71 L.Ed.2d 314 (1982)).

▮▮▮▮ In *Lattimore*, the government called a witness who discussed her pending testimony with three other key government witnesses who had completed their testimony. 902 F.2d at 903. Defense counsel moved for a mistrial on the ground that the rule of sequestration had been violated. *Id.* The motion was denied. *Id.* at 904. We noted that a district court may treat a violation of the sequestration rule by: (1) citing the guilty party for contempt; (2) allowing opposing counsel to cross-examine the witness as to the nature of the violation; or (3) striking the testimony already given or disallowing further testimony where the rule has been intentionally violated and actual prejudice results. *Id.; see United States v. Blasco*, 702 F.2d 1315, 1327 (11th Cir.), *cert. denied*, 464 U.S. 914, 104 S.Ct. 275, 276, 78 L.Ed.2d 256 (1983). Our analysis here is no different than in *Lattimore*. Defense counsel fully cross-examined Purvis, DeWeese, Barclay, and Sheehy about the nature and extent of their contacts with each other, thereby giving the jury the opportunity to evaluate their credibility. Although the record here, as in *Lattimore*, reflects that both the district court and the government were lax in upholding the sequestration rule, which further undermines our confidence in the results of this trial, we do not find that given the curative aspect of the cross-examination, the district court abused its discretion by denying the motion for mistrial.[19]

---

19. We agree with the appellee that *United States v. Espinosa–Hernandez*, 918 F.2d 911 (11th Cir. 1990), is distinguishable. In that case, the defendants' motion stated that the United States

Customs Service agent, whose testimony was the only evidence presented to the grand jury of the defendant's participation in a drug conspiracy, was under investigation for assisting in the

## D. The Photographs

■ The appellants contend that the district court abused its discretion by admitting into evidence two 4x6 inch black and white photographs showing the charred remains of Fred and Joe Hartley. The first photograph, Government Exhibit 7–B, clearly shows the torso of a burned body with an arm extending over a faceless head. The parties stipulated that the second photograph, Government Exhibit 7–C, shows the remains of a body disbursed within the crash site, though no body parts are evident. Several 8x10 inch color photographs depicting the crash area and other 3x5 inch color photographs of sundry evidence were introduced without objection at trial. Defense counsel, however, objected to the black and white photographs under Rule 403 of the Federal Rules of Evidence.[20] The government argued that the photographs were admissible to establish "that this is the activity that motivated people to risk their lives" and that "[m]uch has been made of deal making and liars and soforth [sic] and so on and this is what it comes down to, the element of risk and what these people are willing to do to commit this type of crime." (R8:427). The district court admitted both photographs.

The appellants contend that the photographs of the charred bodies were not relevant, that the cause of the Hartleys' deaths was not in question, that the photographs did not bear on whether any of the defendants had been involved in the importation of cocaine, and that their introduction could only have inflamed the jury. Eyster notes that the photographs related to Count 9, the only count upon which the jury returned a verdict of guilt against him.

■ We addressed the admission of photographs relative to Rule 403 in *United States v. De Parias*, 805 F.2d 1447 (11th Cir.1986), *cert. denied*, 482 U.S. 916, 107 S.Ct. 3189, 96 L.Ed.2d 678 (1987). *De Parias* involved defendants charged with kidnapping and extortion. The defense objected to the introduction of a photograph depicting the badly decomposed body of a murder victim where a coroner was scheduled to testify as to the cause of death. *Id.* at 1453. We found no abuse of discretion because the photograph showed the identity of the victim, the manner of death, and other elements of the crime. *Id.* at 1453–54. Moreover, the coroner's testimony addressing the same issues did not preclude the admission of the photographs. "Rule 403 does not mandate exclusion merely because some overlap exists between the photographs and other evidence." *Id.* at 1454.

Here, we agree with the district court that Government Exhibit 7–C does not appear particularly gruesome in any way and Rule 403 is not implicated. We disagree, however, with the district court's Rule 403 balancing of Government Exhibit 7–B. The photograph is indeed disturbing, but unlike the photograph in *De Parias*, the manner of death of the body was not an issue for the jury to resolve. The photograph simply did not go to whether anyone other than the Hartleys was willing to risk death to engage in smuggling, nor was there need to show the jury the photograph to establish that smugglers are motivated to smuggle given all the evidence about the large sums of money involved. The depiction had no "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. Although we do not find sufficient prejudice in the introduction of the photograph to conclude that the district court abused its

escape of a confidential informant scheduled to testify as a key defense witness in the defendants' trial. We held that under those circumstances, the issues raised by the motion for new trial were not mere impeachment of the agent's testimony. *Id.* at 914.

In the instant case, the three witnesses identified in the motion were thoroughly cross-examined about their admitted discussion relating to their testimony, and the new evidence proffered by defense counsel was unattributed and unsubstantiated.

20. Rule 403 states: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

discretion, we do urge the district court to give greater focus to Rule 403 determinations.

### E. The Jury Selection

█] The appellants contend that the district court violated their Sixth Amendment right to trial before a jury drawn from a cross-section of the community by creating a venire of jurors with surnames that began with letters from only one portion of the alphabet. The district court qualified forty-eight jurors from which thirty-seven potential jurors were selected as the panel from which the parties would strike. Lynn objected when the forty-eight had been called on the grounds "that the panel that has been selected for the jury venire was not done on a random basis." (R7:37). Eyster joined in the motion. The district court noted that the panel represented a fair cross-section of the panel called, and denied the motion. The jury was selected. Lynn later moved the district court to dismiss the indictment, stay the proceedings, or discharge the jury on the grounds that a venire composed of jurors with surnames beginning with letters A through J would overrepresent some ethnic groups while underrepresenting others. Eyster and Marshall joined in the motion. The district court again denied the motion.

We addressed this issue in *United States v. Puleo*, 817 F.2d 702 (11th Cir.), *cert. denied*, 484 U.S. 978, 108 S.Ct. 491, 98 L.Ed.2d 489 (1987), in which the defendant claimed that her trial had been tainted because jurors with last names beginning with the letters M through Z were excluded from the jury. We held that "[w]hile we do not approve this practice, such an action does not systematically exclude a distinctive group of the community." *Id.* at 706; *see Walker v. Goldsmith*, 902 F.2d 16, 17 (9th Cir.1990) (persons with surnames W through Z found not to constitute a distinct class).

The appellants, recognizing our holding in *Puleo*, rely on the Jury Selection and Service Act, 28 U.S.C. §§ 1861–1878 (1988), an issue not raised in *Puleo*. The Act requires a random selection of jurors from a representative sample. 28 U.S.C. §§ 1861, 1866(a). The appellants contend that an arrangement of names in alphabetical order violates the Act's mandate of random selection. The very same contention was brought in *United States v. Haley*, 521 F.Supp. 290 (N.D.Ga.1981). In *Haley*, the district court noted that the Act does not require true or absolute statistical randomness, and that it is sufficient " 'for the purpose of this legislation if the [jury selection] plan adopts some system of selection that affords no room for impermissible discrimination against individuals or groups.' " *Id.* at 294 (quoting S.Rep. No. 891, 90th Cong., 1st Sess. 16, n. 9 (1967)). The district court held that the practice of selecting names in alphabetical order does not violate the Act. *Id.* We agree, although we restate our admonition discouraging the practice.

### F. The Remaining Claims

We conclude by briefly addressing the appellants' remaining claims: first, Eyster's contention that the district court erred in not severing his trial from the trial of his co-defendants; second, Marshall's assertion that the application of the sentencing guidelines against him was unconstitutional; third, Marshall's contention that the district abused its discretion by admitting evidence seized by the government during trial; and lastly, Marshall's claim that the district court erred in refusing to grant his motion for mistrial. We find no merit in these claims.

█ Eyster asserts that the allegations against him involved no hint of violence because he was, if anything, merely a radio man, yet he was subject to the prejudicial spillover effect of evidence concerning the violent tendencies of his co-defendants. In assessing the merits of a severance motion, the district court must balance the possibility of prejudice to the defendant against the public interest in judicial efficiency and economy. *United States v. Walker*, 720 F.2d 1527, 1533 (11th Cir.1983), *cert. denied*, 465 U.S. 1108, 104 S.Ct. 1614, 80 L.Ed.2d 143 (1984). "[S]everance will be granted only if a defendant

can demonstrate that a joint trial will result in specific and compelling prejudice to the conduct of his defense." *Id.* The matter is in the sound discretion of the trial judge. *Id.* We find no showing of actual prejudice and no abuse of discretion.

■ Marshall contends that the sentencing guidelines were incorrectly applied against him because the district court improperly found: (1) that he used or possessed a weapon in connection with the commission of a drug offense, the count of which he was acquitted, and (2) that he was not entitled to an adjustment for acceptance of responsibility. These claims are moot as we are remanding his cause, but we note that under *McMillan v. Pennsylvania*, 477 U.S. 79, 91, 106 S.Ct. 2411, 2418–19, 91 L.Ed.2d 67 (1986), resolving issues at sentencing under a preponderance of the evidence standard is permissible. As to reviewing adjustments under the guidelines, we do so with "great deference." *United States v. Wallace*, 904 F.2d 603, 605 (11th Cir.1990). We do not address Marshall's Eighth Amendment claim as it is no longer before us.

Marshall also contends that the district court abused its discretion in admitting evidence obtained from Marshall's residence in Huntsville, Alabama pursuant to a warrant during the trial. Marshall asserts that the government violated Rule 16(a)(1)(C) of the Federal Rules of Criminal Procedure[21] and that his defense that two "Jack Marshalls" existed, one in Alabama and one in Florida, was prejudiced by the evidence. The government asserts that it made the evidence available to Marshall the very day it was able to contact him through his attorney during the trial recess. The district court determined that the evidence was admissible in accord with *United States v. Euceda–Hernandez*, 768 F.2d 1307, 1311–12 (11th Cir.1985). We find no error in the admission of the evidence.

■ Lastly, we find no merit in Marshall's claim that the district court abused its discretion in denying his motion for mistrial after Purvis stated: "Dealers are anybody that sells drugs to kids, you know, they deserve to be shot. And you wouldn't find anybody in that group with the exception of Jack that would be capable of doing anything like that." (R10:1180). We find that the potential for prejudice was substantially muted given the district court's immediate curative instruction. *See United States v. Holmes*, 767 F.2d 820, 823–24 (11th Cir.1985) (no abuse of discretion where the district court immediately minimized the prejudice through instruction).

## III. CONCLUSION

We are fully aware of the daunting burden the government carries as it seeks to convict the guilty while protecting the innocent. The women and men who prosecute on behalf of the United States are charged with that campaign. It is an awesome responsibility. The realities of the war against crime, especially the battle against the ever-flowing importation of lethal drugs that our circuit is so acutely confronted with, do not escape us. In fighting the menace of those who attempt to profit off crime, however, we must constantly be guided by the principles of our Constitution, lest we win the battle and lose the war.

We REVERSE and REMAND for proceedings consistent with this opinion.

---

21. Rule 16(a)(1)(C) states:
    Upon request of the defendant the government shall permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, buildings or places, or copies or portions thereof,
    which are within the possession, custody or control of the government, and which are material to the preparation of the defendant's defense or are intended for use by the government as evidence in chief at trial, or were obtained from or belong to the defendant.