[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
April 14, 2004
THOMAS K. KAHN
CLERK

_____

No. 02-15521

_____

D.C. Docket Nos. 97-00245-CV-CB-M
and 89-00072-CR-CB

RICHARD LYNN,

Petitioner-Appellant,

versus

UNITED STATES OF AMERICA,

Respondent-Appellee.

_____

Appeal from the United States District Court for the
Southern District of Alabama

_____

**(April 14, 2004)**

Before TJOFLAT, HULL and FAY, Circuit Judges.

PER CURIAM:

In 1997, Richard Joseph Lynn, a federal prisoner, filed a § 2255 motion to vacate his life sentence.  Lynn's direct appeal was dismissed in 1990 because he

escaped from custody while that appeal was pending. The district court denied

Lynn's § 2255 motion. We affirm.

I. PROCEDURAL BACKGROUND

A.    1989 Jury Trial

In 1989, Lynn, Robert Eyster, and Jack Marshall were indicted and tried in

federal court on numerous drug charges.[1]  In a multi-count indictment, Lynn and

his codefendants were charged with participating in an ongoing conspiracy to

import cocaine by plane into Alabama from 1982 to 1989. During those years,

Lynn's drug-trafficking enterprise smuggled massive amounts of cocaine, at least

600 kilograms per load.

The government claimed that Lynn principally directed and administered

the criminal organization, which included pilots, personnel who refueled the

planes in Belize, personnel who unloaded the cocaine in Alabama, radio operators

who monitored law enforcement communications, and persons who distributed the

cocaine. According to the government, Eyster acted as a radio operator in

Alabama and Marshall was an armed "enforcer" who provided intimidation,

---

[1]Of the twenty-four indicted participants in that drug-trafficking organization, four were tried with Lynn: Eyster, Marshall, Ricou DeShaw and Craig Keaser. DeShaw and Keaser were found not guilty of the particular counts with which they were charged.

unloaded cocaine from the airplanes, and transported it to other locations for distribution.

The jury found Lynn, Eyster, and Marshall guilty of drug crimes.[2] The district court sentenced Lynn to seven concurrent life sentences.[3]

B.     Dismissal of Lynn's Direct Appeal

On December 15, 1989, Lynn, along with codefendants Eyster and Marshall, appealed their convictions and sentences to this Court. While his direct appeal was pending with this Court, Lynn escaped from federal custody on or about March 27, 1990.

On June 18, 1990, the government filed a motion to dismiss Lynn's direct appeal based on the fugitive disentitlement doctrine. The government contended

---

[2]Lynn was convicted of seven drug crimes: conspiracy to import cocaine, in violation of 21 U.S.C. § 963; conspiracy to possess with intent to distribute cocaine and marijuana, in violation of 21 U.S.C. § 846; three counts of importation of cocaine, in violation of 21 U.S.C. § 952; and two counts of possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1).

[3]Lynn's base offense level was 36 for importing 13,200 kilograms of cocaine. United States Sentencing Guidelines § 2D1.1(a)(3) (1988). Lynn's offense level was increased by two levels for possession of a firearm during commission of the offense, by four levels for his role as a leader in the drug importation ring, and by two levels for obstruction of justice. Id. at §§ 2D1.1(b)(1), 3B1.1(a), 3C1.1. Lynn's criminal history category III was based on three points for a prior conviction of conspiracy to possess with intent to distribute cocaine and two points for committing the instant offense less than two years after release from imprisonment. Although Lynn's total offense level was 44, Lynn was sentenced based on offense level 43 because that was the highest listed level for his offenses. Lynn's offense level of 43 and criminal history category III resulted in life sentences for each crime.

that because Lynn was a fugitive from justice, his appeal should be dismissed.  See

Estelle v. Dorrough, 420 U.S. 534, 537, 95 S. Ct. 1173, 1175 (1975) ("Disposition

by dismissal of pending appeals of escaped prisoners is a longstanding and

established principle of American law."); Molinaro v. New Jersey, 396 U.S. 365,

366, 90 S. Ct. 498, 499 (1970) (dismissing appeal because defendant's refusal to

surrender to authorities "disentitles [him] to call upon the resources of the Court

for determination of his claims").

On August 17, 1990, this Court granted the government's motion and

dismissed Lynn's direct appeal.  On August 29, 1990, federal authorities

apprehended Lynn, who had remained at large for over five months.[4]

C.     Attempts to Reinstate Direct Appeal

While Lynn was still a fugitive and after his direct appeal was dismissed, his

counsel filed a motion for reconsideration and a proposed brief, asking this Court

to allow counsel to file that brief for Lynn.  After Lynn was captured, Lynn's

counsel filed supplements to that reconsideration motion and a separate motion to

adopt issues from codefendant Eyster's appellate brief.  Two of the claims that

---

[4]On June 26, 1990, Lynn's counsel filed a response to the government's motion to dismiss and asked that this Court give Lynn an opportunity to surrender either by holding the government's motion in abeyance for thirty days or by entering an order prospectively dismissing the appeal after thirty days.  Although that request was not expressly granted, this Court did not dismiss Lynn's appeal until August 17, 1990, which was after this thirty-day period would have expired.

Lynn sought to adopt from Eyster's brief are the same claims made in Lynn's § 2255 motion and this appeal: (1) the prosecutor's improper vouching for the credibility of witness Sheehy; and (2) witness sequestration violations by prosecution witnesses incarcerated together who discussed and tailored their testimony to conform to each other's.

On September 25, 1990, this Court denied Lynn's motion to reconsider the earlier dismissal of his appeal. The proposed appellate brief and motion to adopt Eyster's arguments, both submitted by Lynn's counsel, were returned unfiled. The Supreme Court subsequently denied Lynn's petition for a writ of certiorari regarding our dismissal of his appeal. Lynn v. United States, 499 U.S. 904, 111 S. Ct. 1103 (1991).

D.     1991 Reversal of Eyster's and Marshall's Convictions

Although Lynn's appeal was dismissed, the direct appeals of codefendants Eyster and Marshall remained pending. On December 17, 1991, this Court reversed Eyster's and Marshall's convictions based on the prosecutor's improper vouching for the credibility of Sheehy, a key government witness during the trial. United States v. Eyster, 948 F.2d 1196, 1207-08 (11th Cir. 1991). This Court concluded that the "prosecutor's comments implicated the government's credibility, so infecting the trial with unfairness as to rise to the level of a denial of

5

due process." Id. at 1207. Because Lynn's § 2255 motion claims that his due process rights were violated by this same prosecutorial misconduct, we outline what happened during the 1989 trial.

Witness Sheehy was indicted with defendants Lynn, Eyster, and Marshall, but pled guilty shortly before trial and testified against them. Sheehy pled guilty to only Count 7 (cocaine importation on a flight in July or August 1987) and not to Count 9 (cocaine importation on a flight on September 25, 1987). During the trial, defense counsel emphasized that Sheehy was in a halfway house until July 30, 1987 and living in the Florida Keys in August 1987, and contested Sheehy's credibility by attacking his willingness to admit guilt falsely to Count 7 in order to obtain the benefits of a plea. To rehabilitate Sheehy, the prosecutor on redirect asked Sheehy questions implying that his plea to Count 7, instead of Count 9, was due to a typographical error in his plea agreement.

In reversing, this Court determined: (1) that Sheehy had pled to Count 7; (2) that there was no typographical error; and (3) that by suggesting to the jury that Sheehy meant to plead to Count 9 instead of Count 7, the prosecutor "implicitly vouched for the witness by indicating that information not before the jury supported Sheehy's credibility." Id.

This Court in <u>Eyster</u> concluded that the prosecutor's "improper vouching" tainted Eyster's and Marshall's trial because "the essence of their defense was attacking the credibility of certain key witnesses testifying against them pursuant to plea agreements." <u>Id.</u> at 1208. This Court noted that although the government produced extensive documentary and physical evidence about the drug-trafficking organization, "the government's case against Eyster, and to a lesser degree Marshall, depended heavily on the credibility of witnesses who testified pursuant to plea agreements." <u>Id.</u> at 1200. This Court determined that "there is a reasonable probability that, but for the prosecutor's improper comments, the outcome of the proceeding would have been different," particularly because no physical evidence linked Eyster to the drug-trafficking organization. <u>Id.</u> at 1208.

In their direct appeals, Eyster and Marshall also sought a new trial based on prosecution witnesses' intentionally violating the witness sequestration order.[5] Specifically, witnesses Sheehy, Purvis, DeWeese, and Barclay discussed and tailored their trial testimony while incarcerated together. <u>Id.</u> at 1210. During the trial, defendants were able to elicit testimony from Purvis, DeWeese, and Barclay,

---

[5]On direct appeal, Eyster and Marshall also argued that the district court erred in admitting unfairly prejudicial photographs of the remains of pilots killed in a plane crash and violated their rights to an impartial jury by creating a jury pool of persons with surnames that began with letters from one portion of the alphabet. Lynn's counsel attempted to file a motion to adopt both of these arguments, but his motion was returned unfiled. This Court rejected both arguments in Eyster's and Marshall's direct appeals. <u>Eyster</u>, 948 F.2d at 1212-13.

who admitted to engaging in conversations during trial and to violating the witness sequestration order. Id. at 1210-11. Purvis even admitted to discussing testimony with DeWeese and Sheehy. Id. Defendants also filed a post-trial motion for a new trial based upon Sheehy's admission to his own counsel that there were repeated violations of the witness sequestration order and that he and others had perjured themselves regarding these violations. Id. at 1211.

In our Eyster decision, this Court concluded that Eyster and Marshall were not entitled to a new trial based on the witness sequestration violations. Id. Although this Court noted that "the record . . . reflects that both the district court and the government were lax in upholding the sequestration rule," it ultimately concluded that, "given the curative aspect of the cross-examination," the district court did not abuse its discretion in denying defendants a new trial. Id. (emphasis added). In so concluding, this Court determined that "[d]efense counsel fully cross-examined [witnesses] Purvis, DeWeese, Barclay and Sheehy about the nature and extent of their contacts with each other, thereby giving the jury the opportunity to evaluate their credibility." Id.

E.     Lynn's § 2255 Motion

On March 28, 1997, over five years after this Court reversed Eyster's and Marshall's convictions, Lynn filed a § 2255 motion.[6] Lynn's § 2255 motion contended that his trial was fundamentally unfair in violation of his constitutional due process rights for the same two reasons put forth by Eyster and Marshall in their appeals: (1) the prosecutor's improper vouching for witness Sheehy; and (2) sequestration violations by prosecution witnesses who discussed and tailored their testimony to conform to each other's. Lynn's § 2255 motion stressed that this Court in Eyster had reversed the convictions of Eyster and Marshall based on a violation of their due process right to a fair trial. Because he was tried with Eyster and Marshall, Lynn asserted that he also was denied his constitutional right to a fair trial due to the prosecutor's improper vouching and the witness sequestration violations.

In addition to relying on this Court's reversal of Eyster's and Marshall's convictions, Lynn's § 2255 motion relied on affidavits executed in 1997 by prosecution witnesses Sheehy and Purvis (the "1997 affidavits"). In those 1997 affidavits, Sheehy and Purvis admitted that they discussed and tailored their

---

[6]Because Lynn's convictions were final prior to the enactment of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), Lynn had one year from the AEDPA's effective date on April 24, 1996, or until April 23, 1997, to file his § 2255 motion. See Goodman v. United States, 151 F.3d 1335, 1337 (11th Cir. 1998). Lynn's § 2255 motion was timely filed on March 28, 1997.

testimony to conform to other witnesses' testimony during trial.[7]  Neither affidavit alleges knowledge or complicity on the part of any government agent or attorney at any time; rather, they contain essentially the same claims made in Eyster's and Marshall's direct appeals.

In its 1997 response, the government argued that the claims in Lynn's § 2255 motion were available on direct appeal, that Lynn's escape led to dismissal of his direct appeal in 1990, and that he is procedurally barred from now raising these claims in a § 2255 motion.

On September 1, 1999, Lynn filed (1) a motion to amend and to supplement his original § 2255 motion and (2) new affidavits executed by witness Sheehy on June 29, 1999 and witness Purvis on June 30, 1999 (the "1999 affidavits").  As to his improper vouching claim, Lynn now alleged that the prosecutor admitted during Eyster's appeal that she knew the "Count 7-9 typo" was false and to soliciting perjury knowingly from Sheehy.

As to his witness sequestration claim, Lynn's 1999 motion to amend stated that Lynn sought to add "a newly discovered claim, whose facts and evidence

---

[7]Purvis's and Sheehy's 1997 affidavits are identical to one another and state that: (1) after each day's trial session, they would "meet and thoroughly discuss [their] testimony for that day"; (2) they "engaged in regular, repeated and intentional discussions of [their] testimony during the entire course of the trial"; and (3) they "minimized the extent and significance of those discussions and did not disclose them to the jury" during cross-examination.

'relate back' to the original facts and evidence, on which the 'tailoring' claim was brought." Lynn's motion to amend also stated: (1) that the Sheehy and Purvis 1997 affidavits about the tailoring claim were filed on April 23, 1997; (2) that "during further interviews with witnesses, a much more egregious revelation of prosecutorial misconduct was discovered"; (3) that "subsequent discovery has revealed a new related claim"; (4) that the "newly discovered claim" is that members of the prosecution team "actually cross-pollinated these witnesses" by telling Sheehy and Purvis facts and evidence from other witnesses, facts not within the knowledge of any witness, and facts from the government agents themselves; and (5) "that the government pollinated, primed and pumped witnesses to testify to a parade of perjury."

In the 1999 affidavits filed with Lynn's motion to amend, Sheehy and Purvis repeat part of their admissions (from their 1997 affidavits) that they had discussed and tailored their testimony with other witnesses. However, their 1999 affidavits go further and state, albeit in a conclusory fashion: (1) that the government was involved with their tailoring their testimony to "merge" with other witnesses' testimony;[8] and (2) that the government knew they were testifying

---

[8]In their 1999 affidavits, Sheehy and Purvis each state: (1) that "the government agents and investigators . . . made [him] aware of areas that [his] statements were contradictory with those of other witnesses' statements or expected testimony"; and (2) it was "clear and apparent"

11

about information given to them by agents and of which they had no personal knowledge.[9] Sheehy's and Purvis's 1999 affidavits do not name any government agents or investigators. They also do not give details or a single example of what testimony or statements were tailored or conformed to be consistent or were without personal knowledge.

F. District Court Denies Lynn's § 2255 Motion

On September 16, 2002, the district court granted Lynn's 1999 motion to amend his original § 2255 motion in part and allowed Lynn to file the new affidavits and to add his "newly discovered claim" about the government's

---

that he was "expected to conform [his] statements and testimony to merge with the statements of other government witnesses' statements and testimony, especially where it fit the government's theory of the case, if [he] expected favorable treatment and a positive recommendation from the government at [his] sentencing."

[9]Sheehy's 1999 affidavit states: "It was apparent that the agents during trial, knew we had further opportunity to merge our testimony and that they (the case agents) knew we all, at times, were testifying from information given [to] us by the agents and testifying to facts of which we had no original or personal knowledge, but rather were testifying from information provided by the case agents during interviews." Purvis's 1999 affidavit makes nearly identical allegations and further alleges: "I know this was true for me, and from conversations with other witnesses during trial and after trial, I believe it was true for them as well."

12

complicity in the witnesses' tailoring their testimony.[10]  In the same order, the district court denied Lynn's § 2255 motion in full.

The district court granted a certificate of appealability as to these three issues: (1) the application of procedural bar to Lynn's § 2255 motion; (2) "the prosecutor's improper vouching for the credibility of a government witness"; and (3) "the violation of the sequestration of certain of the government's witnesses."[11] See 28 U.S.C. § 2253(c)(3).

## II. STANDARD OF REVIEW

"In a Section 2255 proceeding, we review legal issues de novo and factual findings under a clear error standard."  United States v. Walker, 198 F.3d 811, 813 (11th Cir. 1999).

## III. DISCUSSION

---

[10]Lynn's counsel timely filed his initial § 2255 motion in 1997, but Lynn pro se filed three motions to amend his § 2255 motion.  Specifically, Lynn pro se filed a first motion to amend on September 1, 1999, a second motion to amend on April 17, 2000, and a third motion to amend on August 17, 2000.  Other than granting Lynn's first motion to amend in part, the district court denied these motions to amend.  As pointed out in Lynn's brief on appeal, "Lynn raised additional claims, and filed motions to amend the § 2255 motion.  The remaining claims, and attempted amendments, are not raised as issues in this appeal."

[11]Although the district court granted in part Lynn's 1999 motion to amend, the district court treated Lynn's new evidence and new claim about the government's complicity in the witnesses' tailoring their testimony as part of his witness sequestration claim.  Thus, we consider Lynn's new evidence and new claim within the ambit of the district court's certificate of appealability.

While we ultimately address the fugitive disentitlement doctrine, we first

explain why Lynn's § 2255 motion is due to be denied under general § 2255

principles.

A.     Claims Cognizable in § 2255 Proceedings

Lynn's § 2255[12] motion seeks to vacate his sentence based on: (1) the

prosecutor's improper vouching for its witness Sheehy; (2) prosecution witnesses

discussing and tailoring their testimony in violation of the witness sequestration

order; and (3) the government's complicity in the witnesses' tailoring their

testimony and testifying to facts not within their personal knowledge.

Courts have long and consistently affirmed that a collateral challenge, such

as a § 2255 motion, may not be a surrogate for a direct appeal.  See, e.g., United

States v. Frady, 456 U.S. 152, 165, 102 S. Ct. 1584, 1593 (1982) (collecting

cases).[13]  Because collateral review is not a substitute for a direct appeal, the

---

[12]28 U.S.C. § 2255 provides in pertinent part:
A prisoner in custody under sentence of a court established by Act of Congress
claiming the right to be released upon the ground that the sentence was imposed in
violation of the Constitution or laws of the United States, or that the court was
without jurisdiction to impose such sentence, or that the sentence was in excess of
the maximum authorized by law, or is otherwise subject to collateral attack, may
move the court which imposed the sentence to vacate, set aside or correct the
sentence.
28 U.S.C. § 2255.

[13]In Frady, the Supreme Court explained:
"When Congress enacted § 2255 in 1948, it simplified the procedure for making a
collateral attack on a final judgment entered in a federal criminal case, but it did not

14

general rules have developed that: (1) a defendant must assert all available claims on direct appeal, <u>Mills v. United States</u>, 36 F.3d 1052, 1055 (11th Cir. 1994);[14] and (2) "[r]elief under 28 U.S.C. § 2255 'is reserved for transgressions of constitutional rights and for that narrow compass of other injury that could not have been raised in direct appeal and would, if condoned, result in a complete miscarriage of justice.'" <u>Richards v. United States</u>, 837 F.2d 965, 966 (11th Cir. 1988) (quoting <u>United States v. Capua</u>, 656 F.2d 1033, 1037 (5th Cir. Unit A Sep. 1981)).  Accordingly, a non-constitutional error that may justify reversal on direct appeal does not generally support a collateral attack on a final judgment, <u>Frady</u>, 456 U.S. at 165, 102 S. Ct. 1593, unless the error (1) could not have been raised on direct appeal and (2) would, if condoned, result in a complete miscarriage of justice.  <u>Stone v. Powell</u>, 428 U.S. 465, 477 n.10, 96 S. Ct. 3037, 3044 n.10 (1976).

---

purport to modify the basic distinction between direct review and collateral review. It has, of course, long been settled that an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment.  The reasons for narrowly limiting the grounds for collateral attack on final judgments are well known and basic to our adversary system of justice."

456 U.S. at 165, 102 S. Ct. at 1593 (quoting <u>United States v. Addonizio</u>, 442 U.S. 178, 184, 99 S. Ct. 2235, 2239 (1979) (footnotes omitted)).

[14]"A ground of error is usually 'available' on direct appeal when its merits can be reviewed without further factual development." <u>Mills</u>, 36 F.3d at 1055.

In many cases in the past, this Court has opted to address the issues of procedural default, cause, and prejudice, as the district court did here, without expressly addressing the threshold inquiry of whether the claimed error is even cognizable in a § 2255 proceeding. However, in some cases, this Court has recognized this threshold issue and concluded that certain claimed errors, even if meritorious on direct appeal, are not cognizable in a § 2255 proceeding. See Burke v. United States, 152 F.3d 1329, 1331-32 (11th Cir. 1998) (stating that "[t]he threshold inquiry is whether Burke's claim that his sentence is contrary to a subsequently enacted clarifying amendment is cognizable under § 2255" and holding his claim does not provide a basis for collateral relief); Richards, 837 F.2d at 966 (noting defendant may not make a statutory non-constitutional claim in a § 2255 motion); Kett v. United States, 722 F.2d 687, 690 (11th Cir. 1984) ("[A]s the district court correctly noted, claims of excessive bail are not cognizable in a section 2255 action.").[15]

---

[15]See also Davis v. United States, 411 U.S. 233, 234-39, 93 S. Ct. 1557, 1578-81 (1973) (concluding that a claim of unconstitutional discrimination in the composition of the grand jury was not cognizable under § 2255); Hill v. United States, 368 U.S. 424, 429, 82 S. Ct. 468, 472 (1962) (sentencing court's failure to comply with Fed. R. Crim. P. 32(a) not cognizable under § 2255); United States v. Velez-Rendon, 845 F.2d 304, 304 (11th Cir. 1988) ("If we were to treat the application as a petition under 28 U.S.C. § 2255 we would have to find that [the petitioner's] claims [that his sentence was illegal under Rule 32] are not cognizable in a habeas corpus proceeding . . . because the errors do not qualify as . . . a complete miscarriage of justice"); Capua, 656 F.2d at 1037 ("In determining whether a claim of error is cognizable under Section 2255, a distinction is drawn between constitutional or jurisdictional errors on the one hand, and

Therefore, in this case, we address the threshold issue of whether Lynn's claims are even cognizable in a § 2255 motion. Lynn argues that the trial errors here are cognizable because they were so fundamentally egregious and prejudicial as to violate his constitutional rights to due process and a fair trial. However, as to the witness sequestration claim, the Eyster Court found that given the curative aspect of the cross-examination, the district court did not abuse its discretion by denying Eyster's and Marshall's motion for a mistrial. 948 F.2d at 1211. Further, as to the improper vouching claim, the Eyster Court relied on the fact that there was limited evidence against Eyster and Marshall in finding that the prejudice from this error rose to the level of a constitutional violation. Id. at 1208. Unlike Eyster and Marshall, Lynn was convicted as the charged leader of the drug-trafficking organization, and Lynn has never asserted that the overall evidence against him was as limited as that against Eyster and Marshall, who both performed lesser roles in the drug conspiracy. We conclude that Lynn's claims of

mere errors of law on the other."); Buckelew v. United States, 575 F.2d 515, 518 (5th Cir. 1978) (concluding that some of the claims "raise no issue of a constitutional violation and thus are not cognizable for review under Section 2255"); Thor v. United States, 574 F.2d 215, 221 (5th Cir. 1978) ("[U]nder these circumstances, the error was not so fundamentally grievous as to be cognizable in a Section 2255 motion."); Delegal v. United States, 363 F.2d 433, 434 (5th Cir. 1966) (stating that "errors asserted in Appellant's motion are not the kind that may be raised by collateral attack under § 2255, which does not provide a substitute for direct appeal").

This Court adopted as binding precedent all Fifth Circuit decisions handed down prior to October 1, 1981. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

improper vouching and witness sequestration violations are fundamentally trial errors that were available on direct appeal and are not cognizable in a § 2255 proceeding.

However, even if this Court were to accept Lynn's characterization of his claims as constitutional claims and as cognizable in a § 2255 motion, the district court nonetheless properly denied Lynn's § 2255 motion for the reasons outlined below.[16]

B.     Procedural Default

Under the procedural default rule, a defendant generally must advance an available challenge to a criminal conviction or sentence on direct appeal or else the defendant is barred from presenting that claim in a § 2255 proceeding. McCoy v. United States, 266 F.3d 1245, 1258 (11th Cir. 2001); Jones v. United States, 153 F.3d 1305, 1307 (11th Cir. 1998); Mills, 36 F.3d at 1055; Greene v. United States, 880 F.2d 1299, 1305 (11th Cir. 1989). This rule generally applies to all claims, including constitutional claims. See Reed v. Farley, 512 U.S. 339, 354, 114 S. Ct. 2291, 2300 (1994) ("Where the petitioner – whether a state or federal

---

[16]Lynn's § 2255 motion was on a district court form wherein Lynn listed his claims. Under each claim, Lynn incorporated by reference a "Memorandum of Law" attached to the form. In the "Memorandum of Law," Lynn asserted that he was denied his constitutional right to a fair trial because of the government's improper vouching and the witnesses' sequestration violations.

prisoner – failed properly to raise his claim on direct review, the writ is available only if the petitioner establishes cause for the waiver and shows actual prejudice resulting from the alleged violation." (internal quotation marks, punctuation, and citations omitted)); see also Wainwright v. Sykes, 433 U.S. 72, 84, 97 S. Ct. 2497, 2505 (1977) (applying cause and prejudice standard to constitutional claims).[17]

A defendant can avoid a procedural bar only by establishing one of the two exceptions to the procedural default rule. Under the first exception, a defendant must show cause for not raising the claim of error on direct appeal and actual prejudice from the alleged error. Bousley v. United States, 523 U.S. 614, 622, 118 S. Ct. 1604, 1611 (1998); Mills, 36 F.3d at 1055; Cross v. United States, 893 F.2d 1287, 1289 (11th Cir. 1990); Greene, 880 F.2d at 1305; Martorana v. United States, 873 F.2d 283, 284 (11th Cir. 1989); Parks v. United States, 832 F.2d 1244,

---

[17]In Massaro v. United States, 123 S. Ct. 1690, 1693 (2003), the Supreme Court reaffirmed that "the general rule [is] that claims not raised on direct appeal may not be raised on collateral review unless the petitioner shows cause and prejudice." However, the Massaro Court excepted ineffective-assistance-of-counsel claims from the general procedural default rule. Id. at 1696 (noting that a § 2255 motion is preferable to direct appeal for deciding claims of ineffective assistance of counsel and that "failure to raise an ineffective-assistance-of-counsel claim on direct appeal does not bar the claim from being brought in a later, appropriate proceeding under § 2255"). In so concluding, the Supreme Court stated:

> The procedural default rule is neither a statutory nor a constitutional requirement, but it is a doctrine adhered to by the courts to conserve judicial resources and to respect the law's important interest in the finality of judgments. We conclude that requiring a criminal defendant to bring ineffective-assistance-of-counsel claims on direct appeal does not promote these objectives.

Id. at 1693.

19

1246 (11th Cir. 1987). Under the second exception, a court may allow a defendant to proceed with a § 2255 motion despite his failure to show cause for procedural default if "'a constitutional violation has probably resulted in the conviction of one who is actually innocent.'" Mills, 36 F.3d at 1055 (quoting Murray v. Carrier, 477 U.S. 478, 496, 106 S. Ct. 2639, 2649 (1986)); see also Bousley, 523 U.S. at 622, 118 S. Ct. at 1611; Jones, 153 F.3d at 1307.

We easily dispense with the second narrow exception because there is no evidence establishing that Lynn is actually innocent.[18] Therefore, we focus on whether Lynn has shown cause and prejudice for not raising his § 2255 claims on direct appeal.

C.     Cause and Prejudice for Procedural Default

In procedural default cases, the question is not whether legal developments or new evidence has made a claim easier or better, but whether at the time of the direct appeal the claim was available at all. See, e.g., Smith v. Murray, 477 U.S. 527, 534, 106 S. Ct. 2661, 2666 (1986); McCoy v. Newsome, 953 F.2d 1252, 1258

---

[18]"This exception is exceedingly narrow in scope as it concerns a petitioner's 'actual' innocence rather than his 'legal' innocence." Johnson v. Alabama, 256 F.3d 1156, 1171 (11th Cir. 2001) (citing Calderon v. Thompson, 523 U.S. 538, 559, 111 S. Ct. 1489, 1502-03 (1998); Murray v. Carrier, 477 U.S. at 495-96, 106 S. Ct. at 2649). "'[A]ctual innocence' means factual innocence, not mere legal innocence." Bousley, 523 U.S. at 623, 118 S. Ct. at 1611.

(11th Cir. 1992); Lomelo v. United States, 891 F.2d 1512, 1515 (11th Cir. 1990).[19]

Further, to show cause for procedural default, Lynn must show that some objective

factor external to the defense prevented Lynn or his counsel from raising his

claims on direct appeal and that this factor cannot be fairly attributable to Lynn's

own conduct.[20]  Smith v. Jones, 256 F.3d 1135, 1145 (11th Cir. 2001) (noting "that

'the existence of cause for a procedural default must ordinarily turn on whether the

prisoner can show that some objective factor external to the defense impeded

counsel's efforts to comply with the State's procedural rule'" (quoting Murray v.

Carrier, 477 U.S. at 488, 106 S. Ct. at 2645)); Johnson v. Alabama, 256 F.3d 1156,

1171 (11th Cir. 2001); McCoy, 953 F.2d at 1258.[21]  Lynn argues that he has shown

---

[19]Perceived futility of a claim does not constitute cause for procedural default.  Smith, 477 U.S. at 535-36, 106 S. Ct. at 2667.  "Omission of the claim will not be excused merely because evidence discovered later might also have supported or strengthened the claim." McClesky v. Zant, 499 U.S. 468, 498, 111 S. Ct. 1454, 1472 (1991).  As stated in Lomelo, "In determining whether cause exists, the Supreme Court has held that the question is not whether subsequent legal developments have made counsel's task easier, but whether at the time of the default the claim was available at all."  891 F.2d at 1515 (internal quotations and citation omitted).

[20]To show cause, a defendant must prove that "some objective factor external to the defense impeded counsel's efforts" to raise the claim previously.  Murray v. Carrier, 477 U.S. at 488, 106 S. Ct. at 2645.  "[C]ause . . . requires a showing of some external impediment preventing counsel from constructing or raising the claim."  Id. at 492, 106 S. Ct. at  2648.

[21]As stated in Lomelo, 891 F.2d at 1515 n.9, "[t]he 'cause and actual prejudice' standard for federal habeas petitions mirrors the standard used to evaluate collateral attacks on state convictions."  Thus, at times in our "cause" analysis, we look to both § 2254 and § 2255 cases.

21

cause because he has new evidence not available at the time of his 1990 direct appeal. We disagree and explain why.

1.     Improper Vouching

We first point out that Lynn does not actually present any new evidence as to his improper vouching claim. Lynn's so-called new evidence is his allegation that the prosecutor admitted during Eyster's direct appeal that she knowingly solicited perjury from Sheehy about the "Count 7-9 typo" and knowingly misled the jury. However, Lynn's allegation is belied by this Court's Eyster decision, which noted that the government continued to assert that it conducted the redirect examination of Sheehy "in good faith" and did not intentionally mislead the jury. 948 F.2d at 1206. This Court further stated that "[i]t is irrelevant whether the prosecutor asked her question in good faith," that "[w]e do not attempt to divine whether the prosecutor indeed had a lapse of memory about the circumstances of Sheehy's plea," and that "the prosecutor cannot vouch for the credibility of a witness even if she devoutly believes the facts she improperly places before the jury." Id. at 1207. Lynn's improper vouching claim is essentially the same as

Eyster's and Marshall's and is procedurally barred due to Lynn's failure to pursue it on direct appeal.[22]

2.      Witness Sequestration Claim

Before discussing the merits of Lynn's claim that "the government pollinated, primed and pumped witnesses to testify to a parade of perjury," we note that there are two ways in which to view Lynn's claim. The first is that Lynn is providing additional evidence that the government was involved in the known witness sequestration violations whereby the witnesses discussed and tailored their testimony to conform to each other's. The second way to view Lynn's claim is that Lynn is actually making a new, separate claim of prosecutorial misconduct; namely, that government agents fed information to prosecution witnesses from both other witnesses and from government agents themselves. Out of an abundance of caution, we address both versions of Lynn's claims.

To the extent Lynn raises a pure witness sequestration claim, Lynn has filed new affidavits, but they do not establish cause to overcome his procedural default of that claim. First, Eyster's brief on direct appeal stressed the intentional witness

_____

[22]Lynn also argues that the government has "unclean hands" and should be barred under principles of equity from asserting procedural default because Lynn's conviction was obtained by intentional government misconduct – improper vouching. However, there is no showing that the improper vouching was intentional. In any event, Lynn, in effect, is inviting this Court to create a third exception to procedural default, which we decline to do.

sequestration violations by the same witnesses, Sheehy and Purvis. Eyster's brief asserted that Sheehy, Purvis, and others intentionally violated the witness sequestration order by discussing and conforming their testimony to one another's while confined in jail during the trial.[23] This Court's <u>Eyster</u> decision already states that the record in that case reflected "that both the district court <u>and the government</u> were lax in upholding the witness sequestration rule." <u>Id.</u> at 1211 (emphasis added). Because Eyster raised this very issue, Lynn has not shown that his claim about the government's involvement with the witness sequestration violations was unavailable at all on direct appeal.

Further, Lynn has not shown that any "objective factor external to the defense" prevented him from raising his witness sequestration claim on direct appeal. <u>Jones</u>, 256 F.3d at 1145; <u>Johnson</u>, 256 F.3d at 1171; <u>McCoy</u>, 953 F.2d at 1258. Rather, the factor preventing Lynn from raising his witness sequestration and improper vouching claims on direct appeal was his unlawful escape from custody. If Lynn had not escaped, this Court would have addressed not only his

---

[23]In Lynn's current appeal, the government included Eyster's direct appeal brief as an attachment wherein Eyster expressly argued: (1) that "[a]fter trial, defense counsel learned that Sheehy had in fact violated the sequestration rule and that Purvis and DeWeese had engaged in repeated violations well beyond the discussions they admitted before the jury"; and (2) that "Sheehy, DeWeese and Purvis repeatedly and intentionally violated the sequestration order, and then lied about it."

improper vouching claim but also his witness sequestration claim in his direct appeal.

Second, to the extent Lynn raises a pure, but stronger, witness sequestration claim, Lynn has not shown cause because he has not satisfied the standards for a new trial based on newly discovered evidence. This Court has concluded that § 2255 motions based on new evidence are subject to the standards generally applicable to motions for a new trial based on new evidence. Greene, 880 F.2d at 1306-07; Bentley v. United States, 701 F.2d 897, 898 (11th Cir. 1983); Everitt v. United States, 353 F.2d 532, 532 (5th Cir. 1965). There are now five requirements that a movant must satisfy before a new trial will be granted based on newly discovered evidence. United States v. Jernigan, 341 F.3d 1273, 1287 (11th Cir. 2003). The five requirements are as follows:

> (1) the evidence was discovered after trial, (2) the failure of the defendant to discover the evidence was not due to a lack of diligence, (3) the evidence is not merely cumulative or impeaching, (4) the evidence is material to issues before the court, and (5) the evidence is such that a new trial would probably produce a different result.

Id. (citations omitted). Furthermore, "we have held that motions for a new trial are highly disfavored, and that district courts should use great caution in granting a new trial motion based on newly discovered evidence." Id. (internal quotation marks and citation omitted). Lynn would have to satisfy these five requirements

25

to obtain a new trial based on new evidence if the issue was raised on direct appeal. The standard is arguably higher, but certainly no lower, for Lynn to obtain a new trial based on new evidence through a § 2255 proceeding.

We need not analyze all five requirements because Lynn's new evidence of the government's involvement in the witness sequestration violations does not meet the third requirement, that the evidence not be merely "cumulative or impeaching." Id. Here, Lynn's new evidence merely provides further impeaching evidence of witness testimony and is also cumulative of evidence already proffered by Lynn's codefendants in the district court and in their direct appeals. Because neither cumulative nor impeaching new evidence is sufficient to satisfy Lynn's burden in a § 2255 proceeding, the district court correctly found that Lynn failed to show cause for his procedural default of his witness sequestration claim.

3.     New Claim of Prosecutorial Misconduct

Although the 1999 affidavits bolster Lynn's witness sequestration claim, it is certainly arguable that the government's alleged complicity – in the witnesses' tailoring their testimony and testifying to facts learned from other witnesses or government agents – creates a new and separate claim of prosecutorial

26

misconduct. To the extent Lynn raises a new claim of prosecutorial misconduct, we conclude that the district properly denied this claim as well.[24]

As outlined above, Eyster and Marshall raised a similar witness sequestration claim in their direct appeals that asserted that witnesses Sheehy and Purvis discussed their testimony with other witnesses and tailored their testimony to conform with each other's. Eyster and Marshall's claim, in effect, was that Sheehy and Purvis perjured themselves by testifying to events not within their personal knowledge but learned from other prosecution witnesses.

In his 1999 motion to amend his § 2255 motion, Lynn claims that Sheehy and Purvis not only learned information from other witnesses but that the two men were fed information from government agents. Lynn claimed that he was able to learn of the government's involvement in this perjurious testimony only after

---

[24]Lynn's new § 2255 claim of prosecutorial misconduct made in 1999 was untimely unless it "related back" to Lynn's timely 1997 § 2255 claims. See Pruitt v. United States, 274 F.3d 1315, 1319 (11th Cir. 2001) ("The Davenport rule makes it clear that the key factor is whether the amended claims arise from the same underlying facts as the original claims."); Davenport v. United States, 217 F.3d 1341, 1344 (11th Cir. 2000) (stating that "in order to relate back, the untimely claim must have arisen from the 'same set of facts' as the timely filed claim, not from separate conduct or a separate occurrence in 'both time and type'") (citations omitted). Because Lynn asserts that the 1999 affidavits about the government's complicity add a new claim of prosecutorial misconduct based on newly discovered facts, we have serious reservations about whether Lynn's new claim of prosecutorial misconduct actually "relates back" to his timely filed § 2255 motion. However, the government does not argue on appeal that Lynn's new claim of prosecutorial misconduct is untimely filed. Accordingly, we assume, but do not decide, for the purposes of this appeal that Lynn's new prosecutorial misconduct claim relates back and is timely.

additional interviews with Sheehy and Purvis.  Lynn asserts that this "newly discovered" evidence of the government's involvement in the perjurious testimony constitutes a new claim of prosecutorial misconduct that was not available on direct appeal.

As discussed above, there are five requirements that Lynn must satisfy in order to obtain a new trial based on newly discovered evidence: (1) the evidence must be discovered after trial; (2) the failure of the defendant to discover the evidence must not be due to a lack of diligence; (3) the evidence must not be merely cumulative or impeaching; (4) the evidence must be material to issues before the court; and (5) the evidence must be such that a new trial would probably produce a different result.  Id.  The government contends that Lynn has not satisfied the five requirements and that Lynn has not shown cause for failing to raise this prosecutorial misconduct claim on direct appeal.  For example, the government challenges Lynn's due diligence, the second requirement, and asserts that Lynn has not explained: (1) "why the information was not tendered until ten years after trial"; (2) whether he took steps "to investigate that matter during the ten-year period between trial and the tendering of the new affidavits"; (3) "how the government prevented the information from being available on direct appeal"; and (4) "the discrepancy . . . between the first and second set of [Purvis and

28

Sheehy] affidavits . . . ." There is also a substantial question whether Lynn has satisfied the fifth requirement that his new evidence is such that a new trial would probably produce a different result.

Even assuming arguendo that Lynn's newly discovered evidence satisfied all five requirements and that Lynn has established cause for his procedural default, Lynn's new claim of prosecutorial misconduct still fails on the merits because the 1999 affidavits contain nothing more than conclusory allegations. In articulating its concerns with the 1999 affidavits, the district court correctly pointed out that the affidavits do not name any government agents or investigators and do not give details or a single example of what testimony or statements were tailored or conformed to be consistent or were based on information fed from government agents. Furthermore, neither 1999 affidavit identified any statement that was made without the witnesses's personal knowledge. Because the 1999 affidavits submitted by Lynn amount to nothing more than mere conclusory allegations, the district court was not required to hold an evidentiary hearing on the issues and correctly denied Lynn's § 2255 motion. Tejada v. Dugger, 941 F.2d 1551, 1559 (11th Cir. 1991) ("A petitioner is not entitled to an evidentiary hearing . . . when his claims are merely conclusory allegations unsupported by specifics . . . ." (internal quotations and citations omitted)); Stano v. Dugger, 901 F.2d 898,

29

899 (11th Cir. 1990) (<u>en banc</u>) ("The petitioner will not be entitled to an evidentiary hearing when his claims are merely 'conclusory allegations unsupported by specifics' . . . ." (quoting <u>Blackledge v. Allison</u>, 431 U.S. 63, 74, 97 S. Ct. 1621, 1629 (1977))); <u>United States v. Jones</u>, 614 F.2d 80, 82 (5th Cir. 1980) ("When claims for habeas relief are based on unsupported generalizations, a hearing is not required." (internal quotations and citations omitted)); <u>Scott v. United States</u>, 598 F.2d 392, 393 (5th Cir. 1979) ("Contrary to [the movant's] assertions, . . . the right to a hearing is not established simply by filing a petition under 28 U.S.C. § 2255. When claims for habeas relief are based on unsupported generalizations, a hearing is not required.").

D.    Fugitive Disentitlement Doctrine

In light of his procedural default problems, Lynn also argues that the usual procedural default rules should not apply because: (1) his direct appeal had a meritorious constitutional claim, as shown by the reversal of Eyster's and Marshall's convictions; (2) his direct appeal was involuntarily dismissed due to his escape; and (3) he surrendered shortly after his direct appeal was dismissed and immediately attempted to reinstate his direct appeal. We discuss the fugitive disentitlement doctrine and explain why the traditional procedural default rules not only apply to Lynn's § 2255 motion, but necessarily do so.

30

The fugitive disentitlement doctrine permits courts to dismiss a fugitive's appeal in cases in which an individual escapes while at the same time attempting to invoke the jurisdiction of that particular court. The Supreme Court first recognized the fugitive disentitlement doctrine in the 1876 case of Smith v. United States, 94 U.S. 97 (1876).[25] See Pesin v. Rodriguez, 244 F.3d 1250, 1252-53 (11th Cir. 2001) (discussing history of fugitive disentitlement doctrine).

In Molinaro v. New Jersey, 396 U.S. 365, 90 S. Ct. 498 (1970), the Supreme Court reaffirmed the fugitive disentitlement doctrine and dismissed a state defendant's direct appeal to the United States Supreme Court because the state defendant was a fugitive from justice. Id. at 365-66, 90 S. Ct. at 498-99. The Molinaro Court reasoned that a fugitive should not be entitled to call upon a court for relief as follows:

> No persuasive reason exists why this Court should proceed to adjudicate the merits of a criminal case after the convicted defendant who has sought review escapes from the restraints placed upon him pursuant to the conviction. While such an escape does not strip the case of its character as an adjudicable case or controversy, we believe it disentitles

---

[25]In Smith, the Supreme Court refused to hear a criminal appeal because the appellant-defendant was a fugitive. 94 U.S. at 98. The Supreme Court reasoned that it had the discretion to refuse to hear the appeal because the appellant-defendant would not necessarily be bound to its ruling: "If we affirm the judgment, he is not likely to appear to submit to his sentence. If we reverse it and order a new trial, he will appear or not, as he may consider most for his interest." Id. at 97. Thus, the Supreme Court concluded that it need not "hear and decide what may prove to be only a moot case." Id.

31

the defendant to call upon the resources of the Court for determination of his claims.

Id. at 366, 90 S. Ct. at 498-99.[26]

In Ortega-Rodriguez v. United States, 507 U.S. 234, 113 S. Ct. 1199 (1993), the Supreme Court explained that the fugitive disentitlement doctrine is a tool primarily for the court that had its jurisdiction invoked while the defendant was a fugitive. See id. at 249, 113 S. Ct. at 1208. In Ortega-Rodriguez, the federal court of appeals had dismissed Ortega-Rodriguez's direct appeal because the defendant had been a fugitive while his case was under the jurisdiction of the district court. Ortega-Rodriguez, however, was "returned to custody before invocation of the appellate system." Id. at 249, 113 S. Ct. at 1208. Although the Supreme Court recognized the continued validity of the fugitive disentitlement doctrine,[27] it determined that the court of appeals applied the fugitive disentitlement doctrine in

---

[26]In Estelle v. Dorrough, 420 U.S. 534, 95 S. Ct. 1173 (1975), the Supreme Court deemed a Texas law constitutional that automatically dismissed a criminal appeal upon the appellant-defendant's escape from custody but reinstated the appeal if the appellant voluntarily surrendered within ten days of his escape. Id. at 535-36, 95 S. Ct. at 1174-75. Noting that the "longstanding and established principle of American law" is that courts may dismiss the pending appeals of escaped prisoners, the Supreme Court accepted Texas's two-tier approach to the fugitive disentitlement doctrine. Id. at 537, 95 S. Ct. at 1175. Specifically, the Court concluded that a state may constitutionally "deal more severely with those who simultaneously invoked the appellate process and escaped from its custody than with those who first escaped from its custody, returned, and then invoked the appellate process." Id. at 541, 95 S. Ct. at 1177.

[27]"It is often said that a fugitive 'flouts' the authority of a court by escaping, and that dismissal is an appropriate sanction for this act of disrespect." Ortega-Rodriguez, 507 U.S. at 245, 113 S. Ct. at 1206 (citations omitted).

too broad a fashion.  Id. at 246-47, 113 S. Ct. at 1207.  The Supreme Court stated that, "[a]bsent some connection between a defendant's fugitive status and his appeal, as provided when a defendant is at large during the ongoing appellate process, the justifications advanced for dismissal of fugitives' pending appeals generally will not apply."  Id. at 249, 113 S. Ct. at 1208 (internal quotations and citation omitted).  Further, the Supreme Court concluded that it was the district court's authority that had been questioned and, therefore, it was the district court – not the court of appeals – that could use the fugitive disentitlement doctrine as a tool to protect the integrity of the judicial system.[28]  Id. at 246, 113 S. Ct. at 1207.

While the Supreme Court in Ortega-Rodriguez concluded that the fugitive disentitlement doctrine was applied too broadly, it also specifically stated that the doctrine retained its validity as a tool for courts to protect the integrity of the judicial process.  Id. at 246, 113 S. Ct. at 1206-07 ("We have no reason here to

---

[28]The Supreme Court did note, however, "that some actions by a defendant, though they occur while his case is before the district court, might have an impact on the appellate process sufficient to warrant an appellate" dismissal under the fugitive disentitlement doctrine.  Ortega-Rodriguez, 507 U.S. at 249, 113 S. Ct. at 1208.  For example, "a long escape, even if it ended before sentencing and appeal, may so delay the onset of appellate proceedings that the Government would be prejudiced in locating witnesses and presenting evidence at retrial after a successful appeal."  Id.  The Supreme Court recognized that appellate courts retain the authority to sanction defendants whose "misconduct at the district court level somehow [made] meaningful appeal impossible or otherwise disrupt[ed] the appellate process so that an appellate sanction is reasonably imposed."  Id. at 249-50, 113 S. Ct. at 1208-09 (internal quotations and citation omitted).

33

question the proposition that an appellate court may employ dismissal as a sanction when a defendant's flight operates as an affront to the dignity of the court's proceedings."). Indeed, the very premise of the fugitive disentitlement doctrine remains the same; namely, "that the fugitive has demonstrated such disrespect for the legal processes that he has no right to call upon the court to adjudicate his claim." Id. at 246, 113 S. Ct. at 1206 (internal quotations omitted).[29]

In Joensen v. Wainwright, 615 F.2d 1077, 1078-80 (5th Cir. 1980), our predecessor court affirmed the district court's denial of the § 2254 petition of a state prisoner whose state direct appeal was dismissed because he escaped from

---

[29]We note that courts possess great latitude in their application of the fugitive disentitlement doctrine. For example, a court may immediately dismiss a fugitive's case without allowing any time for surrender or order a fugitive's case conditionally dismissed unless he surrenders within a certain number of days. See Ortega-Rodriguez, 507 U.S. at 250 n.23, 113 S. Ct. 1209 n.23 ("Though dismissal of fugitive appeals is always discretionary, . . . appellate courts may exercise that discretion by developing generally applicable rules to cover specific, recurring situations."); Estelle, 420 U.S. at 541, 95 S. Ct. at 1177 (stating that a court may "deal more severely with those who simultaneously invoked the appellate process and escaped from its custody than with those who first escaped from its custody, returned, and then invoked the appellate process."); Molinaro, 396 U.S. at 366, 90 S. Ct. at 498-99 (stating that the dismissal of an appeal of a convicted defendant who has escaped from prison need not "await . . . the expiration of a fixed period of time"); Fratus v. United States, 496 F.2d 1190, 1191 (5th Cir. 1974) (dismissing fugitive's appeal without prejudice so that fugitive could reinstate case once he was no longer a fugitive); United States v. Shelton, 482 F.2d 848, 849 (5th Cir. 1973) (remanding to district court to schedule a hearing at which appellant-fugitive shall appear to "show cause why the conditional revocation of his bond and conditional dismissal of his appeal should not be made final").

the state's custody while his direct appeal was pending.[30] The <u>Joensen</u> Court

recognized that the fugitive disentitlement doctrine was constitutional, stating that

"[i]f the [United States] Supreme Court can summarily and unconditionally

dismiss an escapee's appeal without offending the constitution, there is no reason

why a state court may not do likewise." <u>Id.</u> at 1079. In concluding that the

fugitive disentitlement doctrine was constitutional and in denying the § 2254

petition, the <u>Joensen</u> Court stated that a "criminal defendant abandons his appeal

by escaping while the appeal is pending . . . [and that t]here is no constitutional

right to reinstatement of an appeal abandoned by the escape" after recapture. <u>Id.</u> at

1080 (internal citations omitted).

As noted earlier, this Court dismissed Lynn's direct appeal pursuant to the

fugitive disentitlement doctrine.[31] As the district court recognized, this Court's

---

[30]In <u>Joensen</u>, the appellant-prisoner's habeas petition argued that the Florida appellate court violated his procedural due process rights by dismissing his appeal without giving him notice and an opportunity to be heard and by denying his motion to reinstate the appeal without finding that he knowingly waived his right to appeal. 615 F.2d at 1078.

[31]Other circuits follow the rule, as we do, that a criminal defendant abandons and waives his direct appeal by escaping from custody while his appeal is pending. <u>See, e.g.</u>, <u>United States v. Hanzlicek</u>, 187 F.3d 1219, 1220 (10th Cir. 1999); <u>United States v. Lanier</u>, 123 F.3d 945, 946 (6th Cir. 1997); <u>United States v. Corporan-Cuevas</u>, 35 F.3d 953, 957 (4th Cir. 1994); <u>United States v. Puzzanghera</u>, 820 F.2d 25, 27 (1st Cir. 1987); <u>United States v. Freelove</u>, 816 F.2d 479, 480 (9th Cir. 1987); <u>Virgin Islands v. James</u>, 621 F.2d 588, 589 (3rd Cir. 1980); <u>United States v. Sperling</u>, 506 F.2d 1323, 1345 n.33 (2nd Cir. 1974); <u>see also</u> <u>United States v. Vasquez-Gutierrez</u>, 335 F.3d 731, 732 (8th Cir. 2003); <u>United States v. DeValle</u>, 894 F.2d 133, 135-36 (5th Cir. 1990).

35

role is not now to revisit the original dismissal of Lynn's direct appeal.[32]  Further,

in the present case, this Court looks to see the <u>effect</u> of this Court's dismissal of

Lynn's direct appeal on his § 2255 motion.  Specifically, does it make any

difference in the application of the procedural default rule in a § 2255 case that

Lynn's direct appeal was involuntarily dismissed pursuant to the fugitive

disentitlement doctrine?

The government argues that it does and that under the fugitive

disentitlement doctrine Lynn has procedurally waived his right to seek post-

conviction relief in a § 2255 motion.  In contrast, Lynn asserts that his procedural

default should be excused because his direct appeal was meritorious and

involuntarily dismissed under the fugitive disentitlement doctrine.[33]  We conclude

that neither position is correct.  Instead, while the fugitive disentitlement doctrine

---

[32]Lynn asserts that <u>Ortega-Rodriguez</u> fundamentally changed the meaning of the fugitive disentitlement doctrine.  While we expressly decline to revisit the correctness of this Court's dismissal of Lynn's direct appeal, we do note that this Court's earlier decision is in no way undermined by <u>Ortega-Rodriguez</u>.  Rather, Lynn's direct appeal represented the classic case of an individual attempting to invoke the jurisdiction of a court while at the same time remaining a fugitive from justice.  <u>Ortega-Rodriguez</u> in no way changed the application of the fugitive disentitlement doctrine to situations like the one presented in Lynn's direct appeal.  Furthermore, there never has been, nor is there now, a constitutional right to have a direct appeal reinstated after recapture.  See <u>Joensen</u>, 615 F.2d at 1078.

[33]We note that Lynn's assertion that the district court denied his § 2255 motion by using a per se bar is belied by the record.  In this case, the district court did not apply a per se bar.  Rather, the district court applied traditional procedural default rules when reaching the ultimate conclusion that Lynn did not show cause for failing to raise his claims on direct appeal.

governed Lynn's direct appeal, the traditional principles of procedural default govern Lynn's § 2255 motion. Consequently, if a defendant's direct appeal was involuntarily dismissed under the fugitive disentitlement doctrine, a prisoner is not per se barred from filing a § 2255 motion. Rather, a prisoner may proceed with those § 2255 claims that are cognizable and that are not defaulted under the traditional rules of procedural default.

We reach this conclusion for two reasons. First, if we refused to apply traditional rules of procedural default and created a special exception for fugitive-disentitlement dismissals as Lynn advocates, we effectively would render the fugitive disentitlement doctrine a nullity. If traditional rules of procedural default did not apply in this case, the fugitive disentitlement doctrine would lose all meaning as criminal defendants could escape, have their direct appeals dismissed, and then later bring a § 2255 motion as a substitute for a direct appeal. This cannot be and is not the law of this or any other circuit.

In fact, in prior fugitive cases, this Court, in effect, has already applied traditional rules and case law surrounding habeas corpus relief, albeit in the context of § 2254 and not § 2255. In Hall v. Alabama, 700 F.2d 1333 (11th Cir. 1983), a state prisoner escaped while his direct appeal was pending in state court. Id. at 1334. This Court first noted that a § 2254 petitioner must exhaust all state

remedies before filing a § 2254 petition. Id. at 1335. The Hall Court then

concluded that a state prisoner's escape while his direct appeal was pending

constituted a waiver of his right to pursue his direct appeal and thereby precluded

him from exhausting all of his available state remedies. Id. at 1338. Because of

the failure to exhaust, the state prisoner was prohibited from challenging his state

conviction through a § 2254 petition in federal court. Id. Thus, the Hall Court

reached its conclusion through traditional exhaustion principles applicable to

§ 2254 cases.

On the other hand, this Court, in effect, has not allowed the fugitive

disentitlement doctrine to operate as a per se bar to all § 2254 relief where the

state habeas court entertained the defendant's claim and did not consider it barred

by state procedural rules. Stacey v. Warden, 854 F.2d 401, 405 (11th Cir. 1988).

Stacey was convicted in Alabama state court, did not appeal his conviction, and

escaped after serving one year of a thirty-year sentence. Id. at 402. Once

recaptured and sentenced for another crime in Florida, Stacey pursued a state

habeas claim in Alabama alleging ineffective assistance of counsel in his original

conviction. Id. After exhausting state habeas, Stacey filed a § 2254 petition. Id.

The district court dismissed Stacey's § 2254 petition because, according to

the district court, Hall mandated that "Stacey had waived his claim of ineffective

assistance of counsel when he escaped." Id. at 404. On appeal, the government also argued that even if Stacey had not waived his ineffective-assistance-of-counsel claim, Stacey was barred from pursuing a § 2254 petition because his escape from custody was an independent and adequate state ground for the state courts to dismiss Stacey's state petition. Id.

In Stacey, this Court concluded that Hall did not prohibit Stacey from pursuing a § 2254 petition alleging ineffective assistance of trial counsel because "this claim was not reviewable on direct appeal and therefore was not waived" by Stacey's escape. Id. The Stacey Court further concluded that because the state habeas court did not refuse to hear Stacey's ineffective assistance claim due to the fugitive disentitlement doctrine or any other state procedural ground, Stacey had exhausted his available state remedies. Id. at 405. The Stacey Court reached each of these conclusions by applying traditional § 2254 rules and case law regarding waiver, exhaustion of all available state remedies, and procedural default.

Second, our conclusion that traditional rules of procedural default should apply to Lynn's § 2255 motion is consistent with the policy reasons behind the procedural default rule. The procedural default rule does not depend on the circumstances under which an earlier direct appeal was dismissed. That is, the procedural default rule does not depend on whether a movant never filed a direct

39

appeal or appealed but raised different issues. Rather, the procedural default rule in the context of § 2255 looks to conserve judicial resources and protect "the law's important interest in the finality of judgments" by requiring that all available claims be brought on direct appeal and not in a later § 2255 motion. See Massaro v. United States, 123 S. Ct. 1690, 1693 (2003) ("The procedural default rule is neither a statutory nor a constitutional requirement, but it is a doctrine adhered to by the courts to conserve judicial resources and to respect the law's important interest in the finality of judgments."). By applying traditional rules of procedural default to Lynn's § 2255 motion, we are conserving judicial resources, respecting the law's important interest in the finality of judgments, and giving force to the fugitive disentitlement doctrine.

What we learn from Hall, and particularly Stacey and Ortega-Rodriguez, is that the fugitive disentitlement doctrine operates as a sanction where the fugitive status and court proceedings overlap, but it does not generally have a separate, independent application that per se bars motions or appeals later filed by a one-time fugitive. Rather, in the context of habeas corpus, the traditional rules of

exhaustion and procedural default, whether a § 2254 petition or § 2255 motion, ultimately control the disposition of a defendant's claims.[34]

## IV. CONCLUSION

In summary, Lynn's direct appeal was dismissed in 1990 under the fugitive disentitlement doctrine, a doctrine that is as valid today as it was then. Nothing about the fugitive disentitlement doctrine requires this Court to apply anything but traditional rules and case law pertaining to § 2255 proceedings and procedural default. As outlined above, after applying the traditional rules and case law pertaining to § 2255 proceedings and procedural default, we conclude that the district court properly denied Lynn's § 2255 motion.

AFFIRMED.

---

[34]We point out that if a criminal defendant filed a § 2255 motion and then escaped from custody while appealing the district court's denial of his § 2255 motion, a court of appeals would be justified in dismissing the appeal under the fugitive disentitlement doctrine. However, Lynn's escape occurred during his direct appeal in 1990 and not during his § 2255 proceedings, which began in 1997.